Filed: April 12, 2022

Filed on behalf of:
    Patent Owner Masimo Corporation
By:   Joseph R. Re (Reg. No. 31,291)
    Stephen C. Jensen (Reg. No. 35,556)
    Stephen W. Larson (Reg. No. 69,133)
    Jarom D. Kesler (Reg. No. 57,046)
    Jacob L. Peterson (Reg. No. 65,096)
    KNOBBE, MARTENS, OLSON & BEAR, LLP
    2040 Main Street, Fourteenth Floor
    Irvine, CA 92614
    Tel.:  (949) 760-0404
    Fax:  (949) 760-9502
    E-mail:  AppleIPR2020-1521-628@knobbe.com

## UNITED STATES PATENT AND TRADEMARK OFFICE

---

## BEFORE THE PATENT TRIAL AND APPEAL BOARD

---

### APPLE INC.

Petitioner,

v.

### MASIMO CORPORATION,

Patent Owner.

---

Case IPR2020-01521
U.S. Patent 10,292,628

---

## PATENT OWNER'S NOTICE OF APPEAL TO THE U.S. COURT OF APPEALS FOR THE FEDERAL CIRCUIT

Pursuant to 28 U.S.C. § 1295(a)(4)(A), 35 U.S.C. §§ 141(c), 142, and 319, 37 C.F.R. §§ 90.2(a) and 90.3, and Rule 4(a) of the Federal Rules of Appellate Procedure, Patent Owner Masimo Corporation ("Masimo") hereby appeals to the United States Court of Appeals for the Federal Circuit from the Judgement – Final Written Decision (Paper No. 33) entered on April 11, 2022 (Attachment A) and from all underlying orders, decisions, rulings, and opinions that are adverse to Masimo related thereto and included therein, including those within the Decision Granting Institution of *Inter Partes* Review, entered April 14, 2021 (Paper 7). Masimo appeals the Patent Trial and Appeal Board's determination that claims 1–30 of U.S. Patent 10,292,628 are unpatentable, and all other findings and determinations, including but not limited to claim construction, as well as all other issues decided adverse to Masimo's position or as to which Masimo is dissatisfied in IPR2020-01521 involving U.S. Patent 10,292,628.

Masimo is concurrently providing true and correct copies of this Notice of Appeal, along with the required fees, with the Director of the United States Patent and Trademark Office and the Clerk of the United States Court of Appeals for the Federal Circuit.

Respectfully submitted,

KNOBBE, MARTENS, OLSON & BEAR, LLP

Dated:  April 12, 2022        /Jarom Kesler/
                              Jarom D. Kesler (Reg. No. 57,046)
                              Customer No. 64,735

                              Attorney for Patent Owner
                              Masimo Corporation

# ATTACHMENT A

Trials@uspto.gov                                    Paper 33
571-272-7822                                  Date: April 11, 2022

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

APPLE INC.,
Petitioner,

v.

MASIMO CORPORATION,
Patent Owner.

_____

IPR2020-01521
Patent 10,292,628 B1

_____

Before JOSIAH C. COCKS, ROBERT L. KINDER, and
AMANDA F. WIEKER, *Administrative Patent Judges.*

COCKS, *Administrative Patent Judge*.

JUDGMENT
Final Written Decision
Determining All Challenged Claims Unpatentable
*35 U.S.C. § 318(a)*

IPR2020-01521
Patent 10,292,628 B1

# I.  INTRODUCTION

### A.  Background

Apple Inc. ("Petitioner") filed a Petition (Paper 2, "Pet.") pursuant to 35 U.S.C. §§ 311–319 to institute an *inter partes* review of claims 1–30 ("challenged claims") of U.S. Patent No. 10,292,628 B1 (Ex. 1001, "the '628 patent").  We instituted the petitioned review (Paper 7, "Institution Decision" or "Inst. Dec.").

Masimo Corporation ("Patent Owner") filed a Patent Owner Response (Paper 15, "PO Resp.") to oppose the Petition.  Petitioner filed a Reply (Paper 17, "Pet. Reply") to the Patent Owner Response.  Patent Owner filed a Sur-reply (Paper 20, "Sur-reply") to the Reply.  We conducted an oral hearing on January 19, 2022.  A transcript has been entered into the record (Paper 32, "Tr.").

We have jurisdiction under 35 U.S.C. § 6(b)(4) and § 318(a).  This Decision is a final written decision under 35 U.S.C. § 318(a) and 37 C.F.R. § 42.73 as to the patentability of claims 1–30 of the '628 patent.  We determine Petitioner has shown by a preponderance of the evidence that those claims are unpatentable.

### B.  Related Matters

The parties identify the following matters related to the '628 patent:

*Masimo Corporation v. Apple Inc.*, Civil Action No. 8:20-cv-00048 (C.D. Cal.) (filed Jan. 9, 2020);

*Apple Inc. v. Masimo Corporation*, IPR2020-01520 (PTAB Aug. 31, 2020) (challenging claims of U.S. Patent No. 10,258,265 B1);

IPR2020-01521
Patent 10,292,628 B1

>*Apple Inc. v. Masimo Corporation*, IPR2020-01523 (PTAB

Sept. 9, 2020) (challenging claims of U.S. Patent No. 8,457,703 B2);

>*Apple Inc. v. Masimo Corporation*, IPR2020-01524 (PTAB Aug.

31, 2020) (challenging claims of U.S. Patent No. 10,433,776 B2);

>*Apple Inc. v. Masimo Corporation*, IPR2020-01526 (PTAB

Aug. 31, 2020) (challenging claims of U.S. Patent No. 6,771,994 B2);

>*Apple Inc. v. Masimo Corporation*, IPR2020-01536 (PTAB

Aug. 31, 2020) (challenging claims of U.S. Patent No. 10,588,553 B2);

>*Apple Inc. v. Masimo Corporation*, IPR2020-01537 (PTAB

Aug. 31, 2020) (challenging claims of U.S. Patent No. 10,588,553 B2);

>*Apple Inc. v. Masimo Corporation*, IPR2020-01538 (PTAB

Sept. 2, 2020) (challenging claims of U.S. Patent No. 10,588,554 B2); and

>*Apple Inc. v. Masimo Corporation*, IPR2020-01539 (PTAB

Sept. 2, 2020) (challenging claims of U.S. Patent No. 10,588,554 B2).

Pet. 98, Paper 3, 1.

Patent Owner further identifies numerous issued and abandoned applications that are said to claim priority to, or share a priority claim with, the '628 patent. Paper 3, 3.

## C. *The '628 Patent*

The '628 patent is titled "Multi-Stream Data Collection System for Noninvasive Measurement of Blood Constituents," and issued on May 21, 2019, from U.S. Patent Application No. 16/261,326, filed January 29, 2019. Ex. 1001, codes (21), (22), (45), (54). The '628 patent discloses a two-part data collection system including a noninvasive sensor that communicates with a patient monitor. *Id.* at 2:31–33. The sensor includes a sensor housing, an optical source, and several photodetectors, and is used to

3

measure a blood constituent or analyte, e.g., oxygen or glucose. *Id.* at 2:55–3:5. The patient monitor includes a display and a network interface for communicating with a handheld computing device. *Id.* at 2:38–40.

Figure 1 of the '628 patent is reproduced below.



Figure 1 illustrates a block diagram of data collection system 100 including sensor 101 and monitor 109. *Id.* at 5:26–29, 11:36–37. Sensor 101 includes optical emitter 104 and detectors 106. *Id.* at 11:48–50. Emitters 104 emit light that is attenuated or reflected by the patient's tissue at measurement site 102. *Id.* at 13:60–64. Detectors 106 capture and measure the light attenuated or reflected from the tissue. *Id.* In response to the measured light, detectors 106 output detector signals 107 to monitor 109 through front-end interface 108. *Id.* at 13:64–67, 14:16–22. Sensor 101 also may include tissue shaper 105, which may be in the form of a convex surface that:

IPR2020-01521
Patent 10,292,628 B1

(1) reduces the thickness of the patient's measurement site; and (2) provides more surface area from which light can be detected. *Id.* at 10:51–11:3.

Monitor 109 includes signal processor 110 and user interface 112. *Id.* at 15:6–8. "[S]ignal processor 110 includes processing logic that determines measurements for desired analytes . . . based on the signals received from the detectors 106." *Id.* at 15:10–14. User interface 112 presents the measurements to a user on a display, e.g., a touch-screen display. *Id.* at 15:38–42. The monitor may be connected to storage device 114 and network interface 116. *Id.* at 15:52–16:3.

The '628 patent describes various examples of sensor devices. Figures 14D and 14F, reproduced below, illustrate sensor devices.



FIG. 14D

FIG. 14F

Figure 14D illustrates portions of a detector submount and Figure 14F illustrates portions of a detector shell. *Id.* at 6:34–37. As shown in Figure 14D, multiple detectors 1410c are located within housing 1430 and under transparent cover 1432, on which protrusion 605b (or partially cylindrical protrusion 605) is disposed. *Id.* at 36:15–35. Figure 14F illustrates a detector shell 306f including detectors 1410c on substrate 1400c.

IPR2020-01521
Patent 10,292,628 B1

*Id.* at 36:62–37:3. Substrate 1400c is enclosed by shielding enclosure 1490 and noise shield 1403, which include window 1492a and window 1492b, respectively, placed above detectors 1410c. *Id.* Alternatively, cylindrical housing 1430 may be disposed under noise shield 1403 and may enclose detectors 1410c. *Id.* at 37:34–36.

Figures 4A and 4B, reproduced below, illustrate an alternative example of a tissue contact area of a sensor device.



FIG. 4A          FIG. 4B

Figures 4A (left) and 4B (right) illustrate arrangements of protrusion 405 including measurement contact area 470. *Id.* at 23:8–14. "[M]easurement site contact area 470 can include a surface that molds body tissue of a measurement site." *Id.* "For example, the measurement site contact area 470 can be generally curved and/or convex with respect to the measurement site." *Id.* at 23:31–33. The measurement site contact area may include windows 420–423 that "mimic or approximately mimic a configuration of, or even house, a plurality of detectors." *Id.* at 23:39–53.

### D. Illustrative Claim

Of the challenged claims, claims 1, 7, and 20 are independent. Claim 1 is illustrative and is reproduced below.

1. A noninvasive optical physiological sensor comprising:

IPR2020-01521
Patent 10,292,628 B1

[a] a plurality of emitters configured to emit light into tissue of a user;

[b] a plurality of detectors configured to detect light that has been attenuated by tissue of the user, wherein the plurality of detectors comprises at least four detectors;

[c] a housing configured to house at least the plurality of detectors; and

[d] a light permeable cover configured to be located between tissue of the user and the plurality of detectors when the noninvasive optical physiological sensor is worn by the user, wherein the cover comprises an outwardly protruding convex surface configured to cause tissue of the user to conform to at least a portion of the outwardly protruding convex surface when the noninvasive optical physiological sensor is worn by the user and during operation of the noninvasive optical physiological sensor, and wherein the plurality of detectors are configured to receive light passed through the outwardly protruding convex surface after attenuation by tissue of the user.

Ex. 1001, 44:36–56 (bracketed identifiers [a]–[d] added). Independent claims 7 and 20 include similar limitations. *Id.* at 45:9–22; 46:12–34.

### E. *Evidence Relied Upon*

Petitioner relies on the following references:

| Reference | Publication/Patent Number | Exhibit |
|---|---|---|
| Aizawa | U.S. Patent Application Publication No. 2002/0188210 A1, filed May 23, 2002, published December 12, 2002. | 1006 |
| Inokawa | Japanese Patent Application Publication No. 2006-296564 A, filed April 18, 2005, published November 2, 2006. | 1007, 1008[1] |
| Ohsaki | U.S. Patent Application Publication No. 2001/0056243 A1, filed May 11, 2001, published December 27, 2001. | 1014 |

[1] Exhibit 1008 is an English translation of Exhibit 1007.

IPR2020-01521
Patent 10,292,628 B1

| Reference | Publication/Patent Number | Exhibit |
|---|---|---|
| Mendelson-2006 | "A Wearable Reflectance Pulse Oximeter for Remote Physiological Monitoring," Proceedings of the 28th IEEE EMBS Annual International Conference, 912–915 (2006). | 1016 |
| Beyer | U.S. Patent No. 7,031,728 B2 issued April 18, 2006. | 1019 |
| Goldsmith | U.S. Patent Application Publication No. 2007/0093786 A1, filed July 31, 2006, published April 26, 2007. | 1027 |
| Lo | U.S. Patent Application Publication No. 2004/0138568 A1, filed June 15, 2003, published July 15, 2004. | 1028 |
| Mendelson-1988 | "Design and Evaluation of a New Reflectance Pulse Oximeter Sensor," Worcester Polytechnic Institution, Biomedical Engineering Program, Worcester, MA 01609; Association for the Advancement of Medical Instrumentation, Vol. 22, No. 4, 1988, 167–173. | 1015 |

Pet. 1–2.

Petitioner also relies on the declaration testimony of Thomas W. Kenny, Ph.D. (Exhibits 1003 and 1047). Patent Owner relies on the declaration testimony of Vijay K. Madisetti, Ph.D. (Exhibit 2004).

IPR2020-01521
Patent 10,292,628 B1

*F. Asserted Grounds*

We instituted an *inter partes* review based on the following grounds:

| Claim(s) Challenged | 35 U.S.C. § | References/Basis |
|---|---|---|
| 1–15, 17, 20–26, 28 | 103 | Aizawa, Inokawa |
| 1–15, 17, 20–26, 28 | 103 | Aizawa, Inokawa, Ohsaki |
| 18, 19, 29, 30 | 103 | Aizawa, Inokawa, Mendelson-2006, Beyer |
| 18, 19, 29, 30 | 103 | Aizawa, Inokawa, Goldsmith, Lo |
| 1–17, 20–28 | 103 | Mendelson-1988, Inokawa |
| 18, 19, 29, 30 | 103 | Mendelson-1988, Inokawa, Mendelson-2006, Beyer |

II.   ANALYSIS

*A.   Principles of Law*

A claim is unpatentable under 35 U.S.C. § 103 if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious before the effective filing date of the claimed invention to a person having ordinary skill in the art to which said subject matter pertains. *See KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007). The question of obviousness is resolved on the basis of underlying factual determinations, including (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of skill in the art; and (4) objective evidence of non-obviousness.[2] *Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966). When evaluating a combination of teachings, we must also "determine whether there was an apparent reason to combine the

---

[2] Patent Owner does not present objective evidence of non-obviousness.

IPR2020-01521
Patent 10,292,628 B1

known elements in the fashion claimed by the patent at issue." *KSR*, 550
U.S. at 418 (citing *In re Kahn*, 441 F.3d 977, 988 (Fed. Cir. 2006)).
Whether a combination of prior art elements would have produced a
predictable result weighs in the ultimate determination of obviousness. *Id.* at
416–417.

In an *inter partes* review, the petitioner must show with particularity
why each challenged claim is unpatentable. *Harmonic Inc. v. Avid Tech.,
Inc.*, 815 F.3d 1356, 1363 (Fed. Cir. 2016); 37 C.F.R. § 42.104(b). The
burden of persuasion never shifts to Patent Owner. *Dynamic Drinkware,
LLC v. Nat'l Graphics, Inc.*, 800 F.3d 1375, 1378 (Fed. Cir. 2015).

We analyze the challenges presented in the Petition in accordance
with the above-stated principles.

## B.  *Level of Ordinary Skill in the Art*

Petitioner identifies the appropriate level of skill in the art as that
possessed by a person having "a Bachelor of Science degree in an academic
discipline emphasizing the design of electrical, computer, or software
technologies, in combination with training or at least one to two years of
related work experience with capture and processing of data or information."
Pet. 3–4 (citing Ex. 1003 ¶¶ 21–22). "Alternatively, the person could have
also had a Master of Science degree in a relevant academic discipline with
less than a year of related work experience in the same discipline." *Id.* at 4.

Patent Owner "applies Petitioner's level of skill." PO Resp. 10;
Ex. 2004 ¶¶ 36–39. Patent Owner emphasizes that this level of skill requires
no specific education or experience "with optics or optical physiological
monitors" or "in physiology," and instead "focuses on data processing and
not sensor design." PO Resp. 10; Ex. 2004 ¶ 37.

IPR2020-01521
Patent 10,292,628 B1

The level of ordinary skill in the art offered by Petitioner is reasonable based on the record and is agreed to by the parties. We also determine it is consistent with the '628 patent claims and the prior art of record. We adopt Petitioner's expressed level of ordinary skill in the art in this Decision.

## C. Claim Construction

For petitions filed on or after November 13, 2018, a claim shall be construed using the same claim construction standard that would be used to construe the claim in a civil action under 35 U.S.C. § 282(b). 37 C.F.R. § 42.100(b) (2019). Although both parties contend that no claim term requires express construction (Pet. 3; PO Resp. 10), we discern from the substance of the parties' briefing that there is a dispute that emerges for the claim term "cover."

### 1. "cover"

Each of independent claims 1, 7, and 20 requires "a light permeable cover." Ex. 1001, 44:44, 45:18, 46: 22.

Patent Owner argues that the claimed "cover" must be construed to exclude "an optically clear adhesive/epoxy" and a "resin on a surface." PO Resp. 51–52. According to Patent Owner, "the '628 Patent distinguishes a resin on a surface from a cover, explaining: 'the cylindrical housing 1430 (and transparent cover 1432) . . . can protect the detectors 1410c and conductors 1412c *more effectively* than currently-available *resin epoxies*.'" *Id.* at 51 (quoting Ex. 1001, 36:35–45).

Patent Owner alleges that Dr. Kenny also "distinguished a sealing resin from a cover, acknowledging a 'layer of sealing resin' is 'one way to protect the components *without using a cover*.'" *Id.* at 51–52 (quoting

11

IPR2020-01521
Patent 10,292,628 B1

Ex. 2009, 395:22–396:17). Patent Owner argues that its construction is consistent with how a person of ordinary skill in the art would have understood the term based upon the state of the art at the time of filing. *Id.* at 52 (citing Ex. 1008 ¶ 103, Fig. 17; Ex. 1023 ¶ 35; Ex. 1027 ¶ 85, Fig. 9B; Ex. 2004 ¶ 114).

Petitioner replies that "there is nothing in the specification or the prosecution history [of the '628 patent] that would lead a [person of ordinary skill in the art] to conclude that 'cover' should be interpreted based on anything other than its plain meaning." Pet. Reply 28 (citing *Thorner v. Sony Computer Entertainment America LLC*, 669 F.3d 1362, 1368 (Fed. Cir. 2012)). That plain meaning, according to Petitioner, is that "a cover is merely 'something that protects, shelters, or guards.'" *Id.* (quoting Ex. 1050; citing Pet. 70–73; Ex. 1047 ¶ 56). Petitioner argues that Patent Owner's reliance on the '628 patent Specification takes certain text out of context, and when this context is considered, it is clear that "the epoxy resin to which the '628 patent compares its cover is not [an] epoxy cover . . . but rather epoxy that is applied to solder joints." *Id.* at 28 (citing Ex. 1001, 36:41–45; Ex. 1047 ¶ 58).

Petitioner also contends that Patent Owner "mischaracterizes Dr. Kenny's deposition testimony to say he agreed that 'sealing resin' is somehow distinguished from a cover." Pet. Reply 28. Rather, Petitioner contends that Dr. Kenny simply "clarified that using a sealing resin is 'a pretty common way to protect electronic components.'" *Id.* at 28–29 (citing Ex. 2009, 395:22–396:17; Ex. 1047 ¶ 57). Further according to Petitioner, "such extrinsic evidence would not justify departure from plain meaning under *Thorner*." *Id.* at 29.

IPR2020-01521
Patent 10,292,628 B1

Patent Owner maintains in response that the '628 patent Specification disclosure at issue "specifically *distinguishes* a 'resin' on a surface from a 'cover,'" and Petitioner's reading of this disclosure is not persuasive. Sur-reply 21–24.

Upon review of the foregoing, we disagree with Patent Owner's limiting construction of the term "cover" to exclude epoxy and resin. The plain and ordinary meaning of the term does not support Patent Owner's construction. A "cover" ordinarily connotes "something that protects, shelters, or guards." Ex. 1050 (*Merriam-Webster's Collegiate Dictionary*, 11th ed. (©2005)), 288. That plain and ordinary meaning is consistent with the '628 patent's description of "flex circuit cover 360, which can be made of plastic or another suitable material . . . [and] can cover and thereby protect a flex circuit (not shown)." Ex. 1001, 22:63–23:4. It also is consistent with the '628 patent's description and illustration of "transparent cover 1432" in Figure 14D, which covers and protects detectors 1410c and conductors 1412c, and which "can be fabricated from glass or plastic, *among other materials*." *See id.* at 36:27–45 (emphasis added), Figs. 14D–14E.

This is not the situation in which a special definition for a claim term has been set forth in the specification with reasonable clarity, deliberateness, and precision, so as to give notice of the inventor's own lexicography. *See Merck & Co. v. Teva Pharms. USA, Inc.*, 395 F.3d 1364, 1370 (Fed. Cir. 2005); *In re Paulsen*, 30 F.3d 1475, 1480 (Fed. Cir. 1994). Nor do we discern that Patent Owner "demonstrate[d] an intent to deviate from the ordinary and accustomed meaning of a claim term by including in the specification expressions of manifest exclusion or restriction, representing a

13

IPR2020-01521
Patent 10,292,628 B1

clear disavowal of claim scope." *Teleflex, Inc. v. Ficosa North America Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002).

Here, based upon our review of the intrinsic evidence, no such special definition or express disavowal of the term "cover" to exclude epoxy and resin exists. Patent Owner relies on the following description of Figure 14D in that regard:

> In certain embodiments, *the cylindrical housing 1430 (and transparent cover 1432)* forms an airtight or substantially airtight or hermetic seal with the submount 1400c. As a result, the cylindrical housing 1430 can protect the detectors 1410c and conductors 1412c from fluids and vapors that can cause corrosion. Advantageously, *in certain embodiments, the cylindrical housing 1430 can protect* the detectors 1410c and conductors 1412c *more effectively than currently-available resin epoxies*, which are sometimes applied to solder joints between conductors and detectors.

Ex. 1001, 36:36–45 (emphases added). First, the sentence cited by Patent Owner begins with the phrase "in certain embodiments," which indicates the claimed invention is open to other embodiments, so there is no lexicography or disavowal here. Second, we agree with Petitioner's reading of this sentence as distinguishing the prior art from the claimed invention based on the *location* of the material (being applied only to solder joints between conductors and detectors in the prior art, as opposed to covering the conductors and detectors in the invention) and not the *type* of material. Third, at best, the '628 patent expresses a preference for a cover to be made of glass or plastic, because such materials provide "more effective[]" protection than resin epoxies that were known to the inventors of the '628 patent when it was filed. *See id.* at 36:41–45. But even this reading recognizes that resin epoxies provide some amount of protection, albeit

14

IPR2020-01521
Patent 10,292,628 B1

perhaps a lesser amount than glass or plastic, and is not excluded from forming the material of a cover.

Dr. Kenny's deposition testimony cited by Patent Owner also does not persuade us that, in the context of the '628 patent, an epoxy or resin is excluded from the material of a cover. Dr. Kenny testifies that "a layer of sealing resin" "[c]ould" be used to protect the electronic components in a sensor (Ex. 2009, 395:22–396:8). He was then asked "So that would be one way to protect the components without using a cover, correct?" to which he answered "[t]here are many ways to protect the elements other than using a cover" and maintained his proposed combination of prior art has a "cover" to achieve purposes other than protecting electronic components. *Id.* at 396:9–17. He did not squarely testify that sealing resin could never be a cover.

Accordingly, in the context of the '628 patent, we do not construe the claimed "cover" to exclude epoxy and resin.

### 2. *Other Claim Terms*

Upon consideration of the entirety of the arguments and evidence presented, we conclude no further explicit construction of any claim term is needed to resolve the issues presented by the arguments and evidence of record. *See Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co.*, 868 F.3d 1013, 1017 (Fed. Cir. 2017) (per curiam) (claim terms need to be construed "only to the extent necessary to resolve the controversy" (quoting *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999))).

IPR2020-01521
Patent 10,292,628 B1

### D.  Obviousness over Aizawa and Inokawa

Petitioner contends that claims 1–15, 17, 20–26, and 28 of the '628
patent would have been obvious over the combined teachings of Aizawa and
Inokawa.  Pet. 6–43.

#### 1.  Overview of Aizawa (Ex. 1006)

Aizawa is a U.S. patent application publication titled "Pulse Wave
Sensor and Pulse Rate Detector," and discloses a pulse wave sensor worn on
a user's wrist that detects light output from a light emitting diode and
reflected from a patient's artery.  Ex. 1006, codes (54), (57).

Figure 1(a) of Aizawa is reproduced below.



Figure 1(a) is a plan view of a pulse wave sensor.  *Id.* ¶ 23.  As shown in
Figure 1(a), pulse wave sensor 2 includes light emitting diode ("LED") 21,
four photodetectors 22 symmetrically disposed around LED 21, and
holder 23 for storing LED 21 and photodetectors 22.  *Id.*  Aizawa discloses
that, "to further improve detection efficiency, . . . the number of the
photodetectors 22 may be increased."  *Id.* ¶ 32, Fig. 4(a).  "The same effect
can be obtained when the number of photodetectors 22 is 1 and a plurality of
light emitting diodes 21 are disposed around the photodetector 22."  *Id.* ¶ 33.

IPR2020-01521
Patent 10,292,628 B1

Figure 1(b) of Aizawa is reproduced below.



Figure 1(b) is a sectional view of the pulse wave sensor. *Id.* ¶ 23. As shown
in Figure 1(b), pulse wave sensor 2 includes drive detection circuit 24 for
detecting a pulse wave by amplifying the outputs of photodetectors 22. *Id.*
Arithmetic circuit 3 computes a pulse rate from the detected pulse wave and
transmitter 4 transmits the pulse rate data to an "unshown display." *Id.* The
pulse rate detector further includes outer casing 5 for storing pulse wave
sensor 2, acrylic transparent plate 6 mounted to detection face 23a of holder
23, and attachment belt 7. *Id.*

Aizawa discloses that LED 21 and photodetectors 22 "are stored in
cavities 23b and 23c formed in the detection face 23a" of the pulse wave
sensor. *Id.* ¶ 24. Detection face 23a "is a contact side between the holder 23
and a wrist 10, respectively, at positions where the light emitting face 21s of
the light emitting diode 21 and the light receiving faces 22s of the
photodetectors 22 are set back from the above detection face 23a." *Id.*
Aizawa discloses that "a subject carries the above pulse rate detector 1 on
the inner side of his/her wrist 10 . . . in such a manner that the light emitting
face 21s of the light emitting diode 21 faces down (on the wrist 10 side)."
*Id.* ¶ 26. Acrylic transparent plate 6 is disposed between holder 23 and the

IPR2020-01521
Patent 10,292,628 B1

user's wrist 10. *Id.* ¶¶ 23, 26, 30.   Furthermore, "belt 7 is fastened such that the acrylic transparent plate 6 becomes close to the artery 11 of the wrist 10. "Since the acrylic transparent plate 6 is provided on the detection face 23a of the holder 23, adhesion between the pulse rate detector 1 and the wrist 10 can be improved, thereby further improving the detection efficiency of a pulse wave." *Id.* ¶ 30.

### 2.   Overview of Inokawa (Ex. 1008)

Inokawa is a Japanese published patent application titled "Optical Vital Sensor, Base Device, Vital Sign Information Gathering System, and Sensor Communication Method," and discloses a pulse sensor device that may be worn on a user's wrist.  Ex. 1008, code (54), ¶ 56.[3]

Figure 1 of Inokawa is reproduced below.



(FIG. 1)

---

[3] Exhibit 1008 is an English translation of Exhibit 1007.  In this Decision, all citations are to the English translation.

IPR2020-01521
Patent 10,292,628 B1

Figure 1 illustrates a perspective view of a pulse sensor. *Id.* ¶ 56. Pulse sensor 1 includes box-shaped sensor unit 3 and flexible annular wristband 5. *Id.* ¶ 57. Sensor unit 3 includes a top surface with display 7 and control switch 9, and a rear surface (sensor-side) with optical device component 11 for optically sensing a user's pulse. *Id.*

Figure 2 of Inokawa is reproduced below.



(FIG. 2)

Figure 2 illustrates a schematic view of the rear surface of the pulse sensor. *Id.* ¶ 58. The rear-side (sensor-side) of pulse sensor 1 includes a pair of light-emitting elements, i.e., green LED[4] 21 and infrared LED 23, as well as photodiode 25 and lens 27. *Id.* In various embodiments, Inokawa discloses that the sensor-side lens is convex. *See id.* ¶¶ 99, 107. Green LED 21 senses "the pulse from the light reflected off of the body (i.e.[,] change in the amount of hemoglobin in the capillary artery)," and infrared LED 23 senses body motion from the change in reflected light. *Id.* ¶ 59. The pulse sensor stores this information in memory. *Id.* ¶ 68. To read and store information, the pulse sensor includes a CPU that "performs the processing to sense pulse, body motion, etc. from the signal . . . and temporarily stores the analysis data in the memory." *Id.* ¶ 69.

---

[4] We understand "LED" to be an acronym for "light emitting diode."

IPR2020-01521
Patent 10,292,628 B1

Pulse sensor 1 includes lens 27, which "makes it possible to increase the light-gathering ability of the LED as well as to protect the LED or PD[5]." *Id.* ¶¶ 15, 58. Pulse sensor 1 also uses LEDs 21 and 23 to download data to a base station, as shown in Figure 3, reproduced below.



Figure 3 illustrates a pulse sensor mounted on base station 17. *Id.* ¶¶ 60, 66. Pulse sensor 1 is depicted as mounted to base device 17, which "is a charger with communication functionality." *Id.* ¶ 60. When so mounted, sensor optical device component 11 and base optical device component 41 face each other in close proximity. *Id.* ¶ 66. In this position, pulse sensor 1 can output information to the base device through the coupled optical device components. *Id.* ¶ 67. Specifically, the pulse sensor CPU performs the controls necessary to transmit pulse information using infrared LED 23 to photodetector 45 of base device 17. *Id.* ¶¶ 67, 70, 76.

---

[5] We understand "PD" to be an acronym for "photodiode."

In an alternative embodiment, additional sensor LEDs and base photodetectors can be used to efficiently transmit data and improve accuracy. *Id.* ¶ 111.

### 3. Claim 1

#### i. "A noninvasive optical physiological sensor comprising"

The record supports Petitioner's undisputed contention that Aizawa discloses a noninvasive optical sensor.[6] Pet. 23; *see, e.g.*, Ex. 1006 ¶ 2 (disclosing "pulse wave sensor for detecting the pulse wave of a subject from light reflected from a red corpuscle in the artery of a wrist of the subject by irradiating the artery of the wrist").

#### ii. [1a] "a plurality of emitters configured to emit light into tissue of a user;"

[1b] "a plurality of detectors configured to detect light that has been attenuated by tissue of the user, wherein the plurality of detectors comprises at least four detectors;"

##### (1) Petitioner's Undisputed Contentions

Petitioner contends that Aizawa discloses an emitter—LED 21—and also states that, in certain embodiments, multiple LEDs may be employed. Pet. 7, 18. Patent Owner does not dispute this contention, and we agree with Petitioner. *See* Ex. 1006 ¶¶ 23 ("LED 21"), 32 ("The arrangement of the light emitting diode 21 and the photodetectors 22 is not limited to this."). For example, Aizawa explains that "[t]he same effect can be obtained when

---

[6] Whether the preamble is limiting need not be resolved, because Petitioner shows sufficiently that the recitation in the preamble is satisfied by the prior art.

the number of photodetectors 22 is 1 and a plurality of light emitting diodes 21 are disposed around the photodetector." *Id.* ¶ 33.

Petitioner also contends that Inokawa teaches a sensor with two LEDs–a green LED to sense pulse and an infrared LED to sense body motion. Pet. 10–11, 18. Petitioner further contends that when Inokawa's sensor is mounted on a base device, the infrared LED also is used to wirelessly transmit vital information to the base device. *Id.* at 21. Patent Owner does not dispute these contentions, and we agree with them. Inokawa teaches a pair of LEDs 21, 23, where "the basic function of the S-side green LED 21 is to sense the pulse from the light reflected off of the body . . . , while the S-side infrared LED 23 serves to sense body motion from the change in this reflected light." Ex. 1008 ¶¶ 58–59. Inokawa also explains that "vital sign information stored in the memory 63 [of the sensor], such as pulse and body motion, is transmitted to the base device 17 using the S-side infrared LED 23 of the pulse sensor 1 and the B-side PD 45 of the base device 17," such that "there is no need to use a special wireless communication circuit or a communication cable." *Id.* ¶¶ 76–77.

The record further supports Petitioner's undisputed contentions as to the disclosure of multiple photodetectors in Aizawa. *See* Pet. 25–26. Petitioner relies on Aizawa's disclosure of "***four photodetectors 22***" that operate to "detect light 'reflected by a red corpuscle running through the artery 11 of the wrist 10 . . . so as to detect a pulse wave.'" *Id.* (citing Ex. 1006 ¶¶ 24, 27, 29, 32, Fig. 1(a)).

### (2) Petitioner's Disputed Contentions

Petitioner points to Aizawa's disclosure of "a centrally located LED/emitter," but notes that "Aizawa never specifically identifies the use of

IPR2020-01521
Patent 10,292,628 B1

multiple emitters operating at different wavelengths in conjunction with multiple detectors." Pet. 18 (citing Ex. 1006 ¶¶ 23, 33). Petitioner, however, relies on Inokawa as disclosing "two different types of emitters 'such as an infrared LED or a green LED' and that 'work can be divided between the various means, with an infrared LED used to detect vital signs and transmit vital sign information, and a green LED used to detect pulse.'" *Id.* (citing Ex. 1008 ¶¶ 14, 44, 58, 59). Petitioner reasons that a person of ordinary skill in the art "would have found it obvious to incorporate the two LEDs of Inokawa into Aizawa." *Id.* at 24. Petitioner also explains that "[i]t would have been obvious to split the single LED/emitter of Aizawa into two LEDs/emitters having different wavelengths to (i) acquire body motion information for improved pulse detection and/or (ii) more reliably transmit information from the sensor to a base device with less error." *Id.* at 25 (citing Ex. 1008 ¶¶ 7, 14, 44, 48, 58, 59, 60, 62, 77). Furthermore, Petitioner expresses the following:

> The added ability to measure body movement can allow for a more reliable pulse measurement that takes into account and corrects for inaccurate readings stemming from body movement. Thus, a [person of ordinary skill in the art] would have been motivated and found it obvious to divide the single emitter of Aizawa, as shown below into two emitters operating at two difference wavelengths.



*Id.* at 19 (citing Ex. 1003 ¶¶ 75, 76).

IPR2020-01521
Patent 10,292,628 B1

Petitioner additionally contends that applying an additional emitter to Aizawa's device "merely entails the use of known solutions to improve similar systems and methods in the same way" and that Inokawa's teachings of multiple emitters "would have led to predictable results without significantly altering or hindering the functions performed by Aizawa's sensor." *Id.* at 20 (citing *KSR*, 550 U.S. at 417; Ex. 1003 ¶¶ 77–78).

As an additional and independent motivation for incorporating a second emitter in Aizawa, Petitioner contends that, although Aizawa "contemplates uploading data to a base device," it "is silent about how such transmission would be implemented." *Id.* at 20–21.  According to Petitioner, however, a skilled artisan would have "recognized that incorporating Inokawa's base device and LED-based data transmissions would allow Aizawa to upload data from its sensor in a way that is wireless (thus avoiding the problems of a physical cable) and that does not require a separate RF circuit." *Id.* at 22 (citing Ex. 1003 ¶ 81).  According to Dr. Kenny, one of ordinary skill in the art would have "incorporate[d] Inokawa's base device and LED-based data transmission into Aizawa's sensor to, for instance, 'make[] it possible to transmit vital sign information to the base device 17 accurately, easily, and without malfunction'" and "without having to incorporate a separate RF circuit into Aizawa's wrist sensor." Ex. 1003 ¶ 81 (citing Ex. 1008 ¶ 7).  Petitioner further reasons that Inokawa's data transmission disclosure that incorporates two emitters or LEDs provides for increased accuracy of data transmission. *Id.* at 21–22 (citing Ex. 1003 ¶¶ 82, 83).

24

IPR2020-01521
Patent 10,292,628 B1

### (3) *Patent Owner's Contentions*

Patent Owner disputes Petitioner's contentions regarding the obviousness of modifying Aizawa to include two emitters. *See, e.g.*, PO Resp. 35–41; Sur-reply 14–17. According to Patent Owner, "[n]either Aizawa nor Inokawa discloses both a plurality of emitters and at least four detectors." PO Resp. 35 (citing Ex. 2004 ¶ 79). Patent Owner, thus, is of the view that the teachings of the noted references would not have suggested associating multiple emitters with the multiple detectors of Aizawa's sensing device.

In particular, Patent Owner first argues that neither Aizawa nor Inokawa discloses a device with both multiple detectors *and* multiple emitters in the *same* sensor, because Aizawa's embodiments have either a single emitter and multiple detectors (e.g., Ex. 1006, Fig. 1(a)) or multiple emitters and a single detector (e.g., *id.* ¶ 33), and Inokawa discloses multiple emitters and a single detector (e.g., Ex. 1008, Fig. 2). *See* PO Resp. 35–36 (citing, e.g., Ex. 1006 ¶ 33, Figs. 1, 2, 4, 5; Ex. 1008 ¶ 58, Fig. 2; Ex. 2004 ¶¶ 79–80). Patent Owner concludes, therefore, that there would have been no reason for a person of ordinary skill in the art to have added a second emitter to Aizawa, when Aizawa already discloses an embodiment with multiple LEDs, i.e., an embodiment with only a single detector. *Id.* at 36–37 (citing, e.g., Ex. 2004 ¶ 81–83).

Patent Owner also argues that the evidence does not support either of Petitioner's two proffered motivations for modifying Aizawa to include two emitters. As to the first motivation (to measure body movement using a second emitter), Patent Owner asserts that Dr. Kenny erroneously testifies that Aizawa cannot perform such measurement with its single emitter. *Id.*

at 37 (citing, e.g., Ex. 1006 ¶ 15; Ex. 2007, 400:7–401:10; Ex. 2004 ¶ 84).

Patent Owner argues that "Dr. Kenny incorrectly believed that Aizawa's

sensor attempts to prevent motion rather than account for it" but that

"Aizawa expressly states that it provides a 'device for ***computing*** the

***amount*** of motion load from the pulse rate.'"  *Id.* (citing Ex. 1006 ¶ 15; Ex.

2004 ¶ 84).

As to Petitioner's second motivation (to enable transmission of data to

a base device using an optical communication link), Patent Owner argues

that "Aizawa ***already*** includes a wireless transmitter . . . so Aizawa does not

need to incorporate Inokawa's base-device [optical] data transmission

arrangement."  PO Resp. 38 (citing, e.g., Ex. 1006 ¶¶ 23, 28, 35; Ex. 2004

¶¶ 85–86).  Indeed, Patent Owner argues that "Dr. Kenny acknowledged

Aizawa does not indicate there are any problems with Aizawa's form of data

transmission."  *Id.* (citing Ex. 2007, 409:13–410:2).  Patent Owner further

argues that "Aizawa's goal is 'real-time measuring' with the transmitter

'transmitting the measured pulse rate data to a display'" but that "Inokawa's

base device, however, only transmits pulse rate data 'when the pulse sensor

. . . is mounted onto the base device.'"  *Id.* at 38–39 (citing, *e.g.*, Ex. 1008,

Abstract).  Patent Owner also contends that "[r]eplacing Aizawa's wireless

transmission with a base-device-transmitter eliminates the ability to take and

display real-time measurements, one of Aizawa's stated goals, while

increasing power consumption and cost."  *Id.* at 39 (citing Ex. 2009, 381:18–

382:8, 383:22–385:9, 390:5–392:3; Ex. 2004 ¶ 86).  Patent Owner insists

that Inokawa does not aid Petitioner's case, because Inokawa discloses the

benefits of using a second emitter in only two situations, i.e., first, to

improve over a "mechanically-connected system," e.g., with a cable for

communication, and, second, to avoid use of a "dedicated wireless communication circuit," whereas "Aizawa *already* uses wireless transmission to provide real-time measurements." *Id.* at 39–40 (citing, e.g., Ex. 1008 ¶ 4; Ex. 2004 ¶ 87).

Patent Owner further contends that Petitioner and Dr. Kenny overlooked further complications that would ensue from modifying Aizawa to have two emitters. Patent Owner argues that Dr. Kenny did not address issues of thermal interference with sensor performance in adding a second LED to a physiological sensor, which would require "structural changes." PO Resp. 40–41 (citing, e.g., Ex. 1003 ¶ 76; Ex. 2004 ¶ 88; Ex. 2012, 59–60; Ex. 2007, 379:17–21, 384:16–388:16, 389:17–390:20). Patent Owner also argues that Dr. Kenny "acknowledged that changing the size of the emitter cavity could affect the optical performance of the device," but that necessary "redesign" requirements are absent from his testimony and the Petition. *Id.* at 56–57 (citing, e.g., Ex. 2007, 394:11–395:17).

### (4) Petitioner's Reply

As to Petitioner's first motivation, Petitioner contends that adding an additional LED enables the sensor to distinguish between blood flow and body movement, which provides a "more reliable" pulse measurement, and constitutes Petitioner's proposed improvement to Aizawa. Pet. Reply 22 (citing, e.g., Ex. 1003 ¶¶ 76; Ex. 2007, 401:11–402:4; Ex. 1047 ¶ 46). Moreover, Petitioner expresses that by using multiple LEDs at different wavelengths, "two separate signals" can be collected, which "allows noise arising from body motion to be better isolated and accounted for." *Id.* at 22–23 (citing Ex. 1047 ¶ 46–47).

IPR2020-01521
Patent 10,292,628 B1

As to Petitioner's second motivation, Petitioner maintains that Inokawa's use of two emitters having different wavelengths to upload data to a base device using optical communication advantageously improves the accuracy of the transmission by providing "checksum" information. *Id.* at 23 (citing, e.g., Ex. 1003 ¶ 82; Ex. 1008 ¶¶ 44, 48, 111; Ex. 2007, 407:7–408:20, 416:5–15; Ex. 1047 ¶ 48).

In connection with the "other complications" that Patent Owner alleges would result from the proposed modification, Petitioner urges that "such minor issues are 'part of what [a person of ordinary skill in the art] would bring . . . to the problem and would know how to make the changes needed.'" *Id.* at 24 (quoting Ex. 2007, 384:8–388:12; Ex. 1047 ¶ 49).

### (5) *Patent Owner's Sur-reply*

With respect Petitioner's first proposed motivation, Patent Owner argues that Inokawa's disclosure is as sparse as Aizawa's disclosure regarding how to use optical data to measure body movement. Sur-reply 15 (citing Ex. 1008 ¶ 59). Patent Owner also asserts that "Petitioner cites nothing in Inokawa that suggests" that Inokawa's two emitter data gathering is more reliable or otherwise superior to Aizawa's single emitter data gathering. *Id.*

Concerning Petitioner's second motivation, Patent Owner argues that the proposed modification eliminates Aizawa's ability to conduct "***real-time*** collection and display of physiological measurements—a key goal of Aizawa's system." *Id.* at 15–16.

Patent Owner also notes that Petitioner does not dispute that the proposed modification would cause problems such as "additional cost,

28

IPR2020-01521
Patent 10,292,628 B1

energy use, and thermal problems" that would ensue from using two emitters in the Aizawa device. *Id.* at 17.

### *(6) Discussion*

Upon review of the foregoing, we conclude that a preponderance of the evidence supports Petitioner's views that it, in light of Inokawa's teachings, it would have been obvious to replace Aizawa's single near infrared LED 21 with an infrared LED and a green LED.

First, a person of ordinary skill in the art would have had reason to make this replacement to improve the pulse measurements recorded by Aizawa's detector 1. Inokawa teaches that the infrared LED's signal can be used "to detect vital signs" such as "body motion," and the green LED's signal can be "used to detect pulse." Ex. 1008, Fig. 2, ¶¶ 14, 58–59; Ex. 1003 ¶¶ 68, 80, 83–85; Ex. 1047 ¶¶ 46–47.

Patent Owner correctly points out that Aizawa describes its single-emitter detector 1 as transmitting pulse data to "a device for computing the amount of motion load from the pulse rate." Ex. 1006 ¶¶ 15, 28, 35. But, this description is the only disclosure in Aizawa cited by Patent Owner as relating to computing a motion characteristic of the user. Further, we are unable to discern any other disclosure in Aizawa relating to motion computation, or what Aizawa proposes to do with its motion computation. *See id.* Based on the sparse nature of Aizawa's disclosure concerning motion load, it is not clear precisely what Aizawa proposes to do with the computed motion load, after it is computed. *See, e.g.*, Ex. 1047 ¶ 46 ("Aizawa does not even say whether it uses the computed motion load to improve the detection signal."). Aizawa, however, does describe the motion

load as being computed "from the pulse rate," rather than being an input to the pulse rate calculation. Ex. 1006 ¶¶ 15, 35.

In a deposition for other proceedings related to this *inter partes* review (*see supra* § I.B), Dr. Kenny was asked whether it was his understanding that "Aizawa's sensor could not account for motion load?"; Dr. Kenny answered that "Aizawa's sensor attempts to prevent motion load rather than account for it." Ex. 2007, 400:7–11 (deposition for IPR2020-01520, IPR2020-01537, and IPR2020-01539). He explained that, because Aizawa uses only a single emitter with a single wavelength, "what [Aizawa] sees as a signal would be some mixture of pulse rate and motion load if there was no effort to prevent motion load," so Aizawa seeks to solve the problem of "prevent[ing] motion load from corrupting the pulse rate signal." *Id.* at 400:12–401:10. Dr. Kenny did not further explain this distinction between preventing and accounting for motion load in his deposition testimony cited by the parties as relating to this issue. *Id.* at 400:7–402:4. We do not rely on this distinction as a basis for our present decision, because we find no express support for it in Aizawa's disclosure (*see* Ex. 1006 ¶¶ 15, 28, 35), and it is not explained in persuasive detail by Dr. Kenny.

We nonetheless credit Dr. Kenny's declaration testimony that a person of ordinary skill in the art, upon reviewing Inokawa's disclosure of using two emitters of different wavelengths to calculate a user's pulse and motion separately, would understand that these two separate measurements would enable the device to calculate a "more reliable" pulse rate because it "allows noise arising from body motion to be better isolated and accounted for." Ex. 1047 ¶ 47; *see* Ex. 1003 ¶¶ 76–78. Aizawa does not disclose using the computed motion load in this fashion, so it appears that this would improve

upon the accuracy of Aizawa's pulse measurements, by using the computed motion load to isolate and account for noise.  *See* Ex. 1006 ¶¶ 15, 28, 35.

Dr. Madisetti also offers no meaningful opposing testimony in this regard.  *See, e.g.*, Ex. 2004 ¶ 84.  Instead, Dr. Madisetti incorrectly reads Dr. Kenny's motivation testimony as being limited to the desirability of adding the bare ability to measure body movement to Aizawa.  *See id.*  Yet, Dr. Kenny further testified that it would have been beneficial to *use* the measured body movement to *improve* the pulse measurement of the device. *See* Ex. 1003 ¶¶ 76–78; Ex. 1047 ¶ 47.  Dr. Madisetti does not address that testimony.  *See* Ex. 2004 ¶ 84.

Thus, because Dr. Madisetti's testimony does not directly address the entirety of Dr. Kenny's testimony in this regard, Dr. Kenny's testimony stands unrebutted on this point in the record before us.  Dr. Kenny's testimony also makes intuitive sense.  Measuring the user's motion *separately* from the user's pulse, for example by using two interrogating emitters of two different wavelengths, would provide a reliable means of correcting the pulse data for motion artifacts by using the separately measured motion data, rather than by trying to segregate these two components in the single data stream provided by Aizawa's single emitter device.  *See, e.g.*, Ex. 1047 ¶ 47.  We, therefore, are persuaded by Dr. Kenny's unrebutted testimony that using two emitters of different wavelengths would improve Aizawa's device in this way.

Independently, we are also persuaded that a person of ordinary skill in the art would have been motivated to replace Aizawa's single near infrared LED 21 with an infrared LED and a green LED, to provide a reliable method of uploading pulse data stored by Aizawa's wrist-worn pulse rate detector 1

to another device for display to the user.  Inokawa expressly touts such optically-based uploading of data from Inokawa's wrist-worn sensor 1 to Inokawa's base device 17 as a benefit of incorporating two emitters in sensor 1.  *See* Ex. 1008, Figs. 3, 19, ¶¶ 3–7, 14, 76–77, 109–111.  Inokawa identifies two specific benefits of this optically-based data communication means.  First, the infrared LED can transmit the pulse data, and the green LED can separately transmit "checksum" information to increase the accuracy of data transmission.  *Id.* at Fig. 19, ¶¶ 14, 109–111.  Second, using light emitters in this fashion to perform two functions (data collection by emitting light into the user's wrist, and data transmission by emitting light to photodetectors in a base device) obviates the need for providing "a special wireless communication circuit [in the wrist-worn sensor 1] or a communication cable."  *Id.* ¶¶ 3–7, 76–77.

Patent Owner correctly points out that Aizawa already has "transmitter" 4 for uploading pulse data stored by Aizawa's wrist-worn pulse rate detector 1 to another device for processing and for display to the user.  Ex. 1006, Fig. 1(b), ¶¶ 15, 23, 28, 35.  Nevertheless, Aizawa's Figure 1(b) illustrates transmitter 4 only as an empty box contained within outer casing 5, and Aizawa's written description does not provide further structural details concerning transmitter 4.  *See id.*  In particular, Aizawa does not describe exactly how transmitter 4 transmits its data to the other device.  *See id.*

Patent Owner contends, and Dr. Madisetti and Dr. Kenny both testify, that Aizawa's transmitter 4 is a "wireless" transmitter.  *See, e.g.*, PO Resp. 38; Ex. 2004 ¶¶ 85–87; Ex. 2007, 403:17–22, 414:19–21.  They all appear to equate "wireless" communication to radio frequency

communication, and not to include optical communication, even though both radio frequency and optical communication do not use a wire. Based on the foregoing testimony, we assume, for this decision, that Aizawa contemplates radio frequency communication as one embodiment by which transmitter 4 may transmit data to devices other than detector 1.

Patent Owner argues, and Dr. Madisetti testifies, that Aizawa's express disclosure goes even further. They assert that Aizawa's "goal" is to measure and display pulse data *in real time during exercise*, using the wireless transmitter. *See, e.g.*, Ex. 2004 ¶¶ 86–87. We find that Aizawa does not support this assertion. Instead, Aizawa discusses prior art devices that "estimat[e] a burden on the heart of a person who takes exercise by *real-time measuring* his/her heart rate at the time of exercise" (Ex. 1006 ¶ 4 (emphasis added)), and then describes Aizawa's detector 1 as having a transmitter for transmitting the measured pulse rate data to another device for display (*id.* ¶ 15). Aizawa does not indicate when this transmission occurs. Aizawa also refers to "noise caused by the shaking of the body of the subject" as a problem to be addressed (*id.* ¶ 6), but this problem occurs regardless of whether the shaking results from exercise or the normal movement of the user's wrist over the course of the day. Thus, Aizawa does not tout, as an important feature of Aizawa's invention, the *real time display* of pulse rate data during exercise, regardless of whether the data gathered by Aizawa's wrist-worn detector 1 is transmitted wirelessly or otherwise. *Id.* ¶¶ 4, 6, 15.

No doubt, a person of ordinary skill in the art would have viewed the capability of a wrist-worn pulse detector to transmit its pulse data to another device for display in real time while the user is exercising to be a desirable

feature in some cases, even if this is not one of Aizawa's specifically stated goals. *See, e.g.*, Ex. 1003 ¶ 68 (Dr. Kenny stating: "By wirelessly transmitting the collected data wirelessly, Mendelson-2006's system provides 'numerous advantages," including the ability to determine the condition of a subject 'remotely'"); Ex. 2009, 393:6–14 (in a deposition for other related proceedings, Dr. Kenny agreeing that a person of ordinary skill in the art "would have seen the ability to wirelessly transmit collected data as an advantage"). Nonetheless, Inokawa expressly discloses that, in other cases, the benefits achieved by wireless transmission can be outweighed by obviating the need for the wrist-worn sensor to include a special wireless communication circuit. *See* Ex. 1008 ¶¶ 3–7 (discussing problems associated with wireless transmission, such as the need for a dedicated circuit, which is avoided by Inokawa's system that risks "few malfunctions" and has a "simple structure"), 76–77 ("As a result, there is no need to use a special wireless communication circuit . . . , which makes it possible to transmit vital sign information to the base device 17 accurately, easily, and without malfunction."). We therefore conclude that Petitioner's case for obviousness in this regard is supported by a preponderance of the evidence. *See, e.g.*, *In re Urbanski*, 809 F.3d 1237, 1243–44 (Fed. Cir. 2016) (persons of ordinary skill in the art may be motivated to pursue desirable properties of one prior art reference, even at the expense of foregoing a benefit taught by another prior art reference).

We disagree with Patent Owner's argument that Petitioner's case for obviousness is deficient on the basis that neither Aizawa nor Inokawa expressly discloses a wrist-worn sensor device that has *both* a plurality of emitters *and* at least four detectors, as claim 1 recites. Obviousness does not

require "'some motivation or suggestion to combine the prior art teachings'
[to] be found in the prior art." *KSR*, 550 U.S. at 407, 415–418.  Nor does it
require the bodily incorporation of Inokawa's device into Aizawa's device.
*See, e.g.*, *In re Keller*, 642 F.2d 413, 425 (CCPA 1981) (test for obviousness
is not whether the features of one reference may be bodily incorporated into
the structure of the other reference, but rather is "what the combined
teachings of the references would have suggested to those of ordinary skill
in the art"); *see also In re Merck & Co.*, 800 F.2d 1091, 1097 (Fed. Cir.
1986) (nonobviousness is not established by attacking references
individually when unpatentability is predicated upon a combination of prior
art disclosures).  Instead, "[a] person of ordinary skill is also a person of
ordinary creativity, not an automaton," and "in many cases a person of
ordinary skill will be able to fit the teachings of multiple patents together
like pieces of a puzzle." *KSR*, 550 U.S. at 420–421.

In this case, we are persuaded that a person of ordinary skill in the art
would have been motivated to modify Aizawa's wrist-worn detector 1 to
replace its single near infrared LED 21 with an infrared LED and a green
LED, based on Inokawa, for all the reasons provided above.  A person of
ordinary skill in the art would additionally have known to keep all four
detectors 22 that are already present in Aizawa's detector 1, so that "[e]ven
when the attachment position of the sensor is dislocated, a pulse wave can be
detected accurately," as disclosed by Aizawa.  Ex. 1006 ¶¶ 9, 27.  In short,
the combination of Aizawa and Inokawa teaches that having multiple
emitters is beneficial, and having multiple detectors is beneficial, for
different and not inconsistent reasons.

IPR2020-01521
Patent 10,292,628 B1

Finally, we agree with Petitioner's position that any thermal interference and power consumption issues that may arise in Aizawa's wrist-worn pulse detector, by using two emitters instead of one emitter, are well within the capabilities of a person of ordinary skill in the art to solve. We credit Dr. Kenny's testimony in this regard. *See, e.g.*, Ex. 1003 ¶¶ 77–78; Ex. 1047 ¶ 49. Indeed, Dr. Kenny recognizes that Aizawa already discloses adding additional emitters. Ex. 1003 ¶ 77 (citing Ex. 1006 ¶ 32). Dr. Kenny further testifies that this modification "amount[s] to nothing more than the use of a known technique [i.e., Inokawa's use of two emitters in a wrist-worn pulse detector] to improve similar devices [i.e., Aizawa's wrist-worn pulse detector] in the same way, and combining prior art elements according to known methods to yield predictable results." *Id.* ¶ 78.

Patent Owner cites portions of Dr. Kenny's deposition testimony that, in Patent Owner's view, indicate Dr. Kenny fails to appreciate the significance of optical interference complications posed by adding a second emitter to Aizawa's device, and fails to explain how this would have been overcome. *See* PO Resp. 40–41 (citing Ex. 2007, 394:11–395:17). We have reviewed this deposition testimony, and we conclude that Patent Owner overstates its significance. It establishes, at most, that Dr. Kenny did not expressly address this issue in his declaration (Exhibit 1003), but Dr. Kenny's opinion is that this would have been within the capability of a person of ordinary skill in the art to resolve. Based on the evidentiary record presented to us, we agree with Dr. Kenny. For example, Inokawa discloses a wrist-worn pulse sensor 1 having two emitters 21 and 23 in close proximity to each other. *See* Ex. 1008, Figs. 1–2. An artisan must be presumed to know something about the art apart from what the relied-upon references

IPR2020-01521
Patent 10,292,628 B1

disclose. *See In re Jacoby*, 309 F.2d 513, 516 (CCPA 1962). Consistent with Dr. Kenny's testimony, it follows readily from the teachings of the prior art that an ordinarily skilled artisan would have reasonably understood how to implement two emitters as a part of Aizawa's sensor device, including addressing routine design considerations as a part of such implementation. *See, e.g.*, Ex. 1003 ¶¶ 77–78; Ex. 1047 ¶¶ 48–49.

Dr. Madisetti's testimony opposing Dr. Kenny's foregoing opinion is premised solely on Dr. Kenny's alleged failure to explain how issues that arise from adding a second emitter to Aizawa would have been solved. Dr. Madisetti does not provide any affirmative reason why these issues would have been difficult for a person of ordinary skill in the art to solve, in the context of Aizawa's device or wrist-worn pulse sensing devices in general. *See, e.g.*, Ex. 2004 ¶ 88.

On the record at hand, we conclude that a person of ordinary skill in the art would have had adequate reason to replace Aizawa's single near infrared LED 21 with an infrared LED and a green LED, and would have had a reasonable expectation of success in doing so.

   iii.  *"[1c] a housing configured to house at least the plurality of detectors, and"*

The record supports Petitioner's undisputed contentions as to the disclosure of the above-noted housing feature in Aizawa. *See* Pet. 26. Petitioner points to Aizawa's disclosure of "a holder 23 for storing the above light emitting diode 21 and the photodetectors 22." *Id.* (quoting Ex. 1006 ¶¶ 23, 24). We are satisfied that Petitioner sufficiently accounts for the housing feature of claim 1.

IPR2020-01521
Patent 10,292,628 B1

    *iv.*  *"[1d] a light permeable cover configured to be located between tissue of the user and the plurality of detectors when the noninvasive optical physiological sensor is worn by the user, wherein the cover comprises an outwardly protruding convex surface configured to cause tissue of the user to conform to at least a portion of the outwardly protruding convex surface when the noninvasive optical physiological sensor is worn by the user and during operation of the noninvasive optical physiological sensor, and wherein the plurality of detectors are configured to receive light passed through the outwardly protruding convex surface after attenuation by tissue of the user."*

    *(1) Petitioner's Contentions*

The record supports Petitioner's undisputed contentions as to the above-noted feature. *See* Pet. 14–17, 27–30. With reference to an annotated version of Aizawa's Figure 1(b) (reproduced below), Petitioner contends that "Aizawa teaches a light permeable cover in the form of an acrylic transparent plate 6 (blue) that is mounted at the detection face 23a over at least a portion of the housing to cover the at least four detectors (red)." *Id.* at 27.



IPR2020-01521
Patent 10,292,628 B1

The figure above shows Petitioner's annotated and colorized version of Aizawa's Figure 1(b). Petitioner contends that beyond disclosure that the light permeable cover is an "acrylic transparent plate that helps to improve 'detection efficiency,' Aizawa does not provide much other detail, for instance regarding its shape." *Id.* at 14 (citing Ex. 1006 ¶ 30).

Petitioner, however, reasons that one of ordinary skill in the art would have "looked to Inokawa to enhance light collection efficiency, specifically by modifying the light permeable cover of Aizawa to include a convex lens." *Id.* In that regard, Petitioner points to Inokawa's Figure 2. Petitioner's annotated and colorized version of that figure is reproduced below.



*Id.* at 15. Figure 2 above shows a version of Inokawa's Figure 2 that emphasizes the shape of lens 27. Petitioner expresses that "Inokawa teaches that its cover may be either flat . . . such that 'the surface is less prone to scratches'" or may be in the form of the shape shown above to "increase the light gathering ability of the LED." *Id.* at 15 (quoting Ex. 1008 ¶ 15); *see*

Ex. 1003 ¶¶ 92–93.  Petitioner contends that a person of ordinary skill in the art "wanting to achieve improved light collection efficiency over reduced scratch-suseptibility could have modified Aizawa's cover to have a lens shape as per Inokawa."  Pet. 17 (citing Ex. 1003 ¶ 96).  Petitioner also contends that a skilled artisan would have had a reasonable expectation of success in combining those teachings.  *Id.* (citing Ex. 1003 ¶ 96).  Petitioner adds that Aizawa's "transparent acrylic material . . . can be readily formed into a lens-like shape as in Inokawa."  *Id.* (citing Ex. 1003 ¶ 96; Ex. 1023, Fig. 6, ¶¶ 22, 32, 35).

Petitioner colorized and annotated version of Aizawa's Fig. 1(b) (reproduced below) and contends the device resulting from the obvious combination of Aizawa and Onokawa would have replaced the flat cover (left) with a curved one as per Inokawa (right) to "increase the light-gathering ability."  *Id.* at 15 (citing Ex. 1008 ¶ 15).



*Id.* at 16; *see* Ex. 1003 ¶ 94.

Further according to Petitioner: "[a person of ordinary skill in the art] would have understood how to implement Inokawa's lens-shaped cover in Aizawa's device with a reasonable expectation of success."  Pet. 15–17 (citing Ex. 1008, Figs. 16, 17, ¶¶ 15, 106); Ex. 1003 ¶ 98.  The shape of the

IPR2020-01521
Patent 10,292,628 B1

modified cover in Dr. Kenny's illustration of the proposed modification above is similar to the shape of an LED lens unit illustrated in Exhibit 1023[7] (hereafter "Nishikawa"), referenced by Petitioner and Dr. Kenny in in connection with the proposed unpatentability of claims of the '628 patent based on Aizawa and Inokawa. *Compare* Pet. 16–17 (illustrating proposed modification), *with* Ex. 1023, Fig. 6, ¶¶ 3, 22, 30, 32, 35 (illustrating lens unit 50 used with LED 22, and discussing how to make the illustrated device).

Limitation [1d] additionally reqiures that the outwardly protruding convex surface be "configured to cause tissue of the user to conform to at least a portion of the outwardly protruding convex surface." With respect to that tissue conforming aspect, Petitioner additionally reasons that Aizawa's light permeable cover "is designed to be pressed on to the skin of the user with pressure" (Pet. 29 (citing Ex. 1001 ¶¶ 6, 26; Ex. 1003 ¶¶ 97–98)) and that implementing the convex shape of Inokawa's lens in Aizawa's light permeable cover "will cause the tissue of the user to further conform around the convex surface of the lens/protrusion when the device is pressed against the tissue" (*id.* at 29–30 (citing Ex. 1003 ¶¶ 97–98)).

### (2) Patent Owner's Contentions

Patent Owner contends that the evidence does not support Petitioner's argument that it would have been obvious to modify Aizawa's cover to have a convex protrusion, in order to improve detection efficiency by directing incoming light to Aizawa's photodetectors 22, with a reasonable expectation of success. PO Resp. 16–35; Sur-reply 1–14; Ex. 1004 ¶¶ 48–78.

---

[7] US 2007/0145255 A1, published June 28, 2007.

According to Patent Owner, the evidence establishes that Petitioner's proposed modification would direct light *toward the center* of Aizawa's detector 1 where emitter(s) 21 are located, rather than *toward the periphery* where detectors 22 are located.  PO Resp. 16–19; Ex. 2004 ¶¶ 50–57.  Thus, Patent Owner's view is that "a [person of ordinary skill in the art] would ***not*** have expected Inokawa's convex surface to accomplish" the objective of enhancing light collection efficiency relied upon by Petitioner, because Petitioner's proposed modification instead "would direct light ***away*** from the ***periphery***-located detectors" in Aizawa, the opposite result to Petitioner's contention.  PO Resp. 19–22; Ex. 2004 ¶¶ 60–65.

In support, Patent Owner points to Inokawa's Figure 2, in which two arrows illustrate light that passes through the convex protrusion of lens 27 toward the center of Inokawa's pulse sensor 1 where detector 25 is located.  PO Resp. 14 (citing Ex. 1008 ¶ 58); Ex. 2004 ¶¶ 43–44.  Patent Owner also points to the '628 patent's Figure 14B, which illustrates several light rays 1420, 1422 passing through a partially cylindrical protrusion 605 to be centrally focused on detector(s) 1410B.  PO Resp. 18–19 (citing Ex. 1001, 36:56–57, 35:64–66; Ex. 2004 ¶¶ 55–57).  Patent Owner cites portions of Dr. Kenny's deposition testimony that, in Patent Owner's view, support Patent Owner's contentions in these regards.  *See* PO Resp. 2, 18, 19, 23 (citing Ex. 2006, 83:15–84:2, 86:19–87:1, 202:11–204:20).

Patent Owner also asserts that "Dr. Kenny admitted that the impact of Inokawa's convex lens would not be 'obvious' in the context of [the] different configuration of LEDs and detectors" presented by Aizawa.  PO Resp. 20 (citing Ex. 2006, 87:2–6).  For example, Patent Owner points out that "light reaching Aizawa's detectors must travel in an opposite

direction from the light in Inokawa." *Id.* at 20–22 (citing Ex. 1006, Fig. 1(b); Ex. 1008, Fig. 2); Ex. 2004 ¶¶ 61–64.  In addition, according to Patent Owner, "Petitioner's combination is particularly problematic because" Aizawa uses "small detectors [22] with small openings [of cavities 23c] surrounded by a ***large*** amount of ***opaque*** material." PO Resp. 22 (citing Ex. 1006, Fig. 1(a)); Ex. 2004 ¶ 65.  In support of its view, Patent Owner cites portions of Dr. Kenny's deposition testimony. *See* PO Resp. 22 (citing Ex. 2006, 257:11–18).

Patent Owner further argues that Dr. Kenny, during his deposition, attempted to evade the foregoing problems with his declaration testimony by "disclaim[ing] Petitioner's reasoning [for obviousness] and assert[ing] new and improper opinions" that undermine the reasoning provided in the Petition.  PO Resp. 2, 23–24 (citing Ex. 1003 ¶ 94; Ex. 2004 ¶ 66; Ex. 2006, 65:15–70:7, 108:21–109:14, 198:6–16, 202:11–204:20; Ex. 2009, 310:1–20).  For example, Patent Owner asserts that Dr. Kenny's attempt to distinguish between the '628 patent's Figure 14B as illustrating a lens that condenses *collimated* light toward the center, and Aizawa and Inokawa in which the lens focuses *diffuse* light reflected by the user's body, is not persuasive and is not supported by record evidence.  PO Resp. 24–25 (citing Ex. 2006, 170:9–171:5; Ex. 2007, 288:13–289:5, 294:17–298:10, 298:11–299:18, 423:7–424:18); Ex. 2004 ¶¶ 67–68.  Patent Owner also objects to Dr. Kenny's testimony that, "while a convex lens would generally direct more light to the center," it "would also capture some light that otherwise would not be captured" by Aizawa's detectors 22, as lacking evidentiary support other than in the '628 patent itself which is impermissible hindsight. PO Resp. 25–26 (citing Ex. 1001, 7:61–63; Ex. 2004 ¶¶ 69–70; Ex. 2006,

IPR2020-01521
Patent 10,292,628 B1

204:21–206:5, 206:22–208:1; Ex. 2007, 294:17–298:10).  Patent Owner

moreover asserts that "Dr. Kenny repeatedly distanced himself from his own

combination" of Aizawa and Inokawa by refusing to talk about the specific

shape, size, material, and dimensional tolerances of the combination, so, in

Patent Owner's view, his testimony falls short because it demonstrates at

most only that the references could have been combined.  *Id.* at 2–3, 26–30

(citing Ex. 1003 ¶¶ 94, 103; Ex. 2004 ¶¶ 71–72; Ex. 2006, 51:14–52:16,

75:20–77:2, 91:9–92:13, 96:20–21, 97:11–21, 100:17–101:18, 132:10–18,

154:4–7, 164:8–16, 189:11–190:3; Ex. 2007, 308:12–309:8, 310:18–311:9,

318:3–6, 324:21–325:19, 333:20–335:4).

Indeed, according to Patent Owner, because ordinary skill does not

require specific education or experience with optics or optical physiological

monitors (*see supra* Section II.B): "It strains credibility that a [person of

ordinary skill in the art] . . . could balance all of the factors Dr. Kenny

identified" as affecting the performance of a protruding convex lens in an

optical physiological sensor to reach the claimed invention.  PO Resp. 30–31

(citing Ex. 2004 ¶¶ 73–75; Ex. 2006, 51:21–52:16, 93:16–94:15, 100:17–

101:18; Ex. 2009, 347:14–352:18).  Patent Owner relies on Dr. Kenny's

testimony as establishing the complexity of designing optical physiological

sensors.  *Id.* at 3–4, 31 (citing Ex. 2006, 86:19–87:6; Ex. 2007, 331:19–

332:11, 336:11–337:15).  Patent Owner concludes Petitioner has failed to

establish a reasonable expectation of success in reaching the invention of

claim 1 based on Aizawa and Inokawa, because Dr. Kenny's testimony on

this issue "focuses almost entirely on manufacturing."  *Id.* at 31–32 (citing

Ex. 1003 ¶ 96; Ex. 2004 ¶ 75).

Patent Owner moreover asserts Petitioner errs in relying on Nishikawa as supporting the unpatentability of claim 1, because Nishikawa is "not identified as part of" Ground 1A, which instead "includes only two references," Aizawa and Inokawa.  PO Resp. 32 (citing Pet. 1–2, 14; Ex. 1003 ¶¶ 91–96); *id.* at 34 (citing 35 U.S.C. § 312(a)(3); *Intelligent Bio-Systems, Inc. v. Illumina Cambridge Ltd.*, 821 F.3d 1359, 1369 (Fed. Cir. 2016)).  Patent Owner asserts Dr. Kenny "relies heavily" on Nishikawa, particularly "to inform the specific shape of the cover in his combination, which is found nowhere in Aizawa and Inokawa." *Id.* at 32 (citing Pet. 28; Ex. 2004 ¶¶ 76–77; Ex. 2006, 179:21–180:13; Ex. 2007, 364:2–13; Ex. 2008, 73:8–12).

Furthermore, in Patent Owner's view, Dr. Kenny's reliance on Nishikawa "make[s] no sense" because "Nishikawa's device is not a physiological sensor" but rather is "an encapsulated LED" that "directs ***outgoing*** light through the encapsulation material and thus focuses on the emission of light, not the detection of an optical signal." PO Resp. 34 (citing Ex. 1023, code (57), ¶¶ 3, 32, 35; Ex. 2004 ¶ 78).  Patent Owner contrasts such disclosure with Aizawa and Inokawa, both of which "detect[] ***incoming*** light that passes through the cover and reaches the detectors," and which have a "drastically" smaller scale than Nishikawa's LEDs. *Id.* at 34–35 (citing Ex. 1008, Fig. 2; Ex. 2004 ¶ 78).

### *(3) Petitioner's Reply*

In reply, Petitioner insists "Inokawa's lens enhances the light-gathering ability of Aizawa," which would have motivated an ordinarily skilled artisan "to incorporate 'an Inokawa-like lens [having a convex protrusion] into the cover of Aizawa to increase the light collection

efficiency.'"  Pet. Reply 2–3 (bolding omitted) (citing Pet. 14–16, 28;
Ex. 1003 ¶¶ 91–96; Ex. 1008, Fig. 2, ¶¶ 15, 58).  Petitioner dismisses Patent
Owner's and Dr. Madisetti's opposition as being "misinformed" regarding
Inokawa's lens and lenses in general, because "a [person of ordinary skill in
the art] would understand that Inokawa's lens improves 'light concentration
at pretty much all of the locations under the curvature of the lens,' as
opposed to only at a single point at the center."  *Id.* at 3–4 (quoting
Ex. 2006, 164:8–16); *id.* at 1, 3–4 (citing PO Resp. 13; Ex. 1041, 89:12–19;
Ex. 1042, 170:12–20); Ex. 1047 ¶¶ 3–5, 19–23.

For example, Petitioner contends that Patent Owner and Dr. Madisetti
"ignore[] the well-known principle of reversibility" according to Snell's
law.[8]  Pet. Reply 4–7 (underlining omitted) (citing Ex. 1043, 80:20–82:20;
Ex. 1049, 101, 106–111; Ex. 1052,[9,10] 84, 87–92); Ex. 1047 ¶¶ 31–39.
Petitioner contends that Dr. Madisetti was evasive when he was asked to
apply the reversibility principle to the combination of Aizawa and Inokawa
in this case.  Pet. Reply 6 (citing Ex. 1041, 89:12–19, 84:2–85:7).

Petitioner also asserts that Patent Owner and Dr. Madisetti overlook
the fact that light rays reflected by body tissue in the user's wrist, to be
received by detectors in either Aizawa's or Inokawa's pulse sensor, will be

---

[8]  Snell's law describes how a light ray will be refracted when passing
between two mediums having different indices of refraction.  *See* Ex. 1047
¶ 10 (describing and illustrating Snell's law).

[9]  Eugene Hecht, *Optics* (2nd ed. 1990).

[10]  It is apparent that the page numbering identified by Petitioner for Exhibit
1052 refers to the documents native page numbering and not the page
numbering of the exhibit appearing at the bottom, middle of each page.  For
clarity and consistency, in this Decision, we also use the same page
numbering as Petitioner for Exhibit 1052.

"scattered" and "diffuse" and, therefore, will approach the detectors "from various random directions and angles." Pet. Reply 7–8 (citing Ex. 1046, 803; Ex. 2012, 52, 86, 90); *id.* at 8–10 (annotating Inokawa's Fig. 2 to illustrate the cause and nature of the back-scattering); Ex. 2020 ¶ 128; Ex. 1047 ¶¶ 6–9. This scattered and diffuse light, according to Petitioner, means that Inokawa's "lens cannot focus all incoming light at a single point" at a central location as Patent Owner would have it. Pet. Reply 8 (citing Ex. 1047 ¶ 6; Ex. 2006, 163:12–164:2). Petitioner asserts this is due to Snell's law, and provides several illustrations to illustrate why. *Id.* at 8–13 (citing Ex. 1043, 80:20–82:20; Ex. 1049, 101; Ex. 1052, 84; Ex. 1047 ¶¶ 6–18; Ex. 2012, 52, 86, 90; Ex. 2020 ¶ 128).

Due to the random nature of this scattered light, Petitioner explains that one of ordinary skill in the art would have understood that "Inokawa's lens provides at best a slight refracting effect, such that light rays that otherwise would have missed the detection area are instead directed toward that area as they pass through the interface provided by the lens." Pet. Reply 14 (citing Ex. 1047 ¶ 18). Petitioner applies this understanding to Aizawa, and contends that using a lens with a convex protrusion in Aizawa would "enable backscattered light to be detected within a circular active detection area surrounding" a central light source, thereby "allowing a larger fraction of the backscattered light to reach the areas covered by the lens" including the circular detection area. *Id.* (citing Ex. 1047 ¶ 18–22; Ex. 1046, 803; Ex. 2006, 164:8–16, 204:21–205:12; Ex. 2012, 86, 90). Dr. Kenny provides the following illustration of this alleged effect. *See* Ex. 1047 ¶ 21; Pet. Reply 14.

IPR2020-01521
Patent 10,292,628 B1



Here, Dr. Kenny has excerpted a portion of his illustration of using a lens with a convex protrusion (in blue) on top of Aizawa's pulse rate detector (with a photodetector, in red) (*see* Ex. 1003 ¶ 94), and added several dotted lines that are orthogonal to the lens surface. Pet. Reply 15–16; Ex. 1047 ¶¶ 20–22. Dr. Kenny testifies that Snell's law indicates "the incoming light rays are refracted in a way that deflects incoming rays somewhat towards these orthogonal lines," and that because "these orthogonal lines vary in orientation most rapidly near the edge, where the illustrated curvature of the lens surface is the greatest," using this lens in Aizawa "would lead to an improvement in the light concentration at the location of the detectors." Ex. 1047 ¶¶ 21–22.

Petitioner further contends that one of ordinary skill in the art, upon reading Inokawa's disclosure that its lens 27 "makes it possible to increase the light-gathering ability of the LED" in an optically-based pulse sensor device (Ex. 1008 ¶ 15), would have understood that this "general benefit" could also be achieved within the context of Aizawa's optically-based pulse sensor device, and is not limited to "the exact" structure of Inokawa's device. Pet. Reply 16 (citing Ex. 1003 ¶¶ 60, 93–95; Ex. 1047 ¶ 23; Ex. 2006, 88:21–89:1, 89:21–90:3).

48

IPR2020-01521
Patent 10,292,628 B1

Petitioner additionally argues that Dr. Madisetti's testimony in support of Patent Owner's position ignores the application of Snell's law to the random nature of backscattered light in the context of Aizawa's and Inokawa's pulse sensors, which measure light *reflected* (i.e., backscattered) by the user's tissue. Pet. Reply 14 (citing Ex. 1042, 166:12–182:3); Ex. 1047 ¶ 17. Petitioner similarly dismisses the applicability of Figure 14B of the '628 patent as illustrating the operation of a *transmittance*-type of sensor that measures the attenuation of collimated light transmitted through the user's body tissue, rather than the *reflectance*-type sensors of Aizawa and Inokawa. *Id.* at 18–19 (citing Ex. 1001, 35:62–64, Fig. 14I; Ex. 1047 ¶¶ 24–28; Ex. 2007, 287:12–289:5).

Petitioner further maintains that Patent Owner's argument that Petitioner's illustrations of the light-focusing properties of a convex lens discussed in the Petition filed in IPR2020-01520 (Ex. 2019, 39) and relied upon by Dr. Kenny (Ex. 2020, 119–120) does not demonstrate "that a convex lens directs all light to the center." Pet. Reply 18–19 (citing PO Resp. 16–17, 23; Ex. 1041, 41:7–22, 60:7–61:6). Petitioner contends these illustrations, instead, "are merely simplified diagrams included to illustrate . . . one example scenario (based on just one ray and one corpuscle) where a light permeable cover can 'reduce a mean path length of light traveling to the at least four detectors'" as recited in claim 12. *Id.* (citing Pet. 39; Ex. 2020 ¶¶ 119–120; Ex. 1047 ¶¶ 29–30).

### (4) Patent Owner's Sur-reply

Patent Owner submits that Petitioner's Reply improperly presents several new arguments, relying on new evidence, as compared with the Petition. *See, e.g.*, Sur-reply 3 n.3 (objecting to the illustration provided at

IPR2020-01521
Patent 10,292,628 B1

Pet. Reply 14 as being "new"); *id.* at 5 ("After recognizing the fundamental error in its proposed combination, Petitioner now attempts to rewrite its petition" concerning how a lens with a convex protrusion would focus light in Aizawa's device); *id.* at 7 ("Petitioner's new theory [concerning reversibility of light rays] is improper, denying [Patent Owner] of the opportunity to respond with expert testimony, and should be rejected."); *id.* at 10 ("Petitioner next asserts a number of other new theories found nowhere in the petition.").

Patent Owner also contends that Petitioner mischaracterizes Patent Owner's position, which is not that Inokawa's lens with a convex protrusion "direct[s] '*all*' light 'only at a *single point* at the center'" of the sensor as Petitioner characterizes it. Sur-reply 1–2 & n.2 (quoting Pet. Reply 3–4, and citing PO Resp. 2, 14–17, 23–25, 27 and Ex. 2027, 63:7–64:6, 94:20–96:1, 96:18–97:7). Patent Owner's position, rather, is that Inokawa's lens condenses more light (not necessarily all light) "*towards* a more central location" (not necessarily at a single, central point) relative to Aizawa's flat cover. *Id.* at 2–3 (quoting PO Resp. 18, and citing Ex. 2004 ¶¶ 34, 44, 51, 53, 54, 57, 67).

Patent Owner moreover asserts "[t]here can be no legitimate dispute that a convex surface directs light centrally (and away from the periphery)," so Petitioner errs in its view that a [person of ordinary skill in the art] would have used a convex lens with Aizawa's detector 1 to improve its light detection efficiency, because Aizawa's photodetectors 22 are disposed at the periphery of the device. Sur-reply 3–6 (citing PO Resp. 15–18; Ex. 2006, 164:8–16, 166:10–17, 170:22–171:5; Ex. 2020 ¶¶ 119, 200; Ex. 2027, 181:9–182:5). Patent Owner contends that Petitioner's argument "that

50

IPR2020-01521
Patent 10,292,628 B1

Inokawa would improve light-gathering at all locations, ***regardless*** of the location of the LEDs and detectors" is belied by Dr. Kenny's testimony that "Inokawa's benefit would ***not*** be clear if Inokawa's LEDs and detectors were moved" and "confirmed that a convex surface would direct light toward the center of the underlying sensor." *Id.* at 6 (citing Pet. Reply 3–4; Ex. 2006, 86:19–87:6, 202:11–204:20).

Patent Owner argues that Petitioner's discussion of the principle of reversibility is "irrelevant" because it "assumes ideal conditions that are not present when tissue scatters and absorbs light." Sur-reply 7–8 (citing Ex. 2027, 17:12–19:2, 29:11–30:7, 31:8–32:3, 38:17–42:6, 207:9–209:21, 210:8–6). The random nature of backscattered light, in Patent Owner's view, "hardly supports Petitioner's argument that light will necessarily travel the same paths regardless of whether the LEDs and detectors are reversed," and is irrelevant to the central issue presented here of "whether a convex surface—***as compared with a flat surface***—would collect and focus additional light on Aizawa's peripherally located detectors." *Id.* at 8–9 (citing Ex. 2006, 86:19–87:6; Ex. 2027, 212:3–14).

In response to Petitioner's argument that "due to its protruded shape, Inokawa's lens 'provides an opportunity to capture some light that would otherwise not be captured'" in Aizawa (Pet. Reply 15), Patent Owner asserts that "Dr. Kenny was unable to support this new theory with any evidence." Sur-reply 11 (citing Ex. 2007, 294:17–298:10). Patent Owner further contends that Petitioner "fails to consider the greater ***decrease*** in light at the detectors due to light redirection to a ***more*** central location." *Id.* at 13 (citing Pet. Reply 20; Ex. 2027, 19:16–21:8). Patent Owner expresses that "the circle of backscattered light's intensity '***decreases*** in direct proportion

IPR2020-01521
Patent 10,292,628 B1

to the *square of the distance* between the photodetector and the LEDs,'" so "any purported signal obtained from light redirected from the sensor's *edge* would be relatively weak and fail to make up for the much greater loss of signal strength when light is redirected away from the detectors and towards a more central position." *Id.* (citing Ex. 1015, 168; Ex. 2027, 49:17–50:13, 57:10–22).

### (5) Discussion

Upon review of the foregoing, we conclude that a preponderance of the evidence supports Petitioner's view that it would have been obvious to modify Aizawa's cover 6 to include a convex lens or protrusion like that taught in Inokawa, in order to increase the amount of backscattered light that will be received by Aizawa's four peripheral detectors 22, as compared with Aizawa's existing flat cover.

It is clear that Aizawa's and Inokawa's pulse sensors both gather data by emitting light into the user's wrist tissue, and collecting light that reflects back to the sensor from within the user's tissue. *See, e.g.*, Ex. 1006, Figs. 1(b), 2 (sensor 2 has emitter 21 and four detectors 22, all facing a user's wrist 10); Ex. 1008, Figs. 1, 2 (sensor 1 has two emitters 21, 23 and one detector (photodiode 25), all facing the user's wrist when held in place by wristband 5). Dr. Kenny testifies, and Patent Owner agrees, that the reflection of this light by the user's wrist tissue randomizes the propagation direction of the reflected light rays. *See* Ex. 1003 ¶ 128; Ex. 1047 ¶¶ 6–7; Ex. 2020 ¶ 128; Sur-reply 7–8 ("Even Petitioner admits that tissue randomly scatters and absorbs light rays . . . ."). This reflection principle is illustrated by Dr. Kenny's annotations to Inokawa's Figure 2 reproduced below:

IPR2020-01521
Patent 10,292,628 B1



Here, Dr. Kenny has modified Inokawa's Figure 2 (1) by removing two
black arrows, (2) by coloring Inokawa's light detector in red and Inokawa's
two light emitters in green, and (3) by adding several green arrows to
illustrate the various directions that light rays may be directed after
impinging on and reflecting off different tissues in the user's wrist.
Ex. 1047 ¶¶ 6–7.

This randomized direction of reflected light rays results in
backscattered light that is diffuse, rather than collimated, in nature.
Figure 4.12 of Exhibit 1052 illustrates the difference between diffuse and
collimated light, and is reproduced below:



IPR2020-01521
Patent 10,292,628 B1

This figure provides at left a photograph and an illustration showing incoming collimated light reflecting from a smooth surface, and at right a photograph and an illustration of incoming collimated light reflecting from a rough surface. *See* Ex. 1052, 87–88. The smooth surface provides specular reflection, in which the reflected light rays are collimated like the incoming light rays. *See id.* The rough surface provides diffuse reflection, in which the reflected light rays travel in random directions. *See id.*

This diffuse nature of the light reflected from the user's wrist tissue, which both Aizawa and Inokawa aim to collect to generate pulse data, suggests that a lens might be useful to increase the amount of collected light and thereby increase the reliability of the pulse data generated using the collected light. Indeed, that is taught by Inokawa. Inokawa describes using its lens 27 to "increase the light-gathering ability" of Inokawa's light photodiode or detector 25. Ex. 1008 ¶¶ 15, 58. Although Inokawa refers to the "LED" such as emitters 21, 23 in that regard (*id.* ¶ 15), rather than photodiode 25, it is undisputed that photodiode 25 is the only component of Inokawa's sensor 1 that gathers light. Furthermore, there is also no dispute that Inokawa's lens 27 is understood to be shaped as a convex protrusion. *See, e.g.*, Ex. 1003 ¶¶ 92–93 (characterizing Inokawa as teachings a "convex protrusion that acts as a lens"); PO Resp. 1 (describing Inokawa as teaching a "convex lens"). Thus, Inokawa demonstrates that it was known in the art prior to the '628 patent to use a lens comprising a convex protrusion to focus diffuse light reflected from body tissue on to the light detecting elements of a wrist-worn pulse sensor, and to increase the light gathered by the sensor thereby improving the device's calculation of the user's pulse.

IPR2020-01521
Patent 10,292,628 B1

A preponderance of the evidence supports Petitioner's view that it would have been obvious for a person of ordinary skill in the art to apply Inokawa's lens technology to Aizawa's wrist-worn pulse sensor, so as to improve its light collection in a similar manner versus Aizawa's existing flat cover. That is illustrated by the following illustrations provided by Dr. Kenny:



The illustration at left modifies Aizawa's Figure 1(b) to show how Aizawa's existing flat cover may be modified to incorporate a convex protrusion (in blue) to act as a light-focusing lens, which covers Aizawa's four peripheral light detectors (two shown in red) and central light emitter (colored green). *See* Ex. 1003 ¶ 94. The illustration at right zooms in on the portion of this modification covering one of the detectors, and adds several dotted lines that are orthogonal to the lens surface. *See* Ex. 1047 ¶¶ 20–21. We are persuaded by Dr. Kenny's testimony that Snell's law indicates "the incoming light rays are refracted in a way that deflects incoming rays somewhat towards these orthogonal lines," and that because "these orthogonal lines vary in orientation most rapidly near the edge, where the illustrated curvature of the lens surface is the greatest," using the illustrated lens taught by Aizawa and Inokawa "would lead to an improvement in the light concentration at the location of the detectors." *Id.* ¶¶ 18–22 (applying Snell's law to the prior art); *id.* ¶¶ 8–17 (discussing Snell's law in the abstract).

IPR2020-01521
Patent 10,292,628 B1

Patent Owner correctly notes that Inokawa's single detector 25 is located in the central portion of Inokawa's sensor 1, whereas Aizawa's four detectors 22 are located more towards the periphery of Aizawa's sensor 2. *Compare* Ex. 1008, Fig. 2, *with* Ex. 1006, Figs. 1(a)–1(b). Nevertheless, Petitioner's proposed modification of Aizawa takes that circumstance into account, as can be seen by the following comparison between Inokawa's sensor and Petitioner's proposed modification of Aizawa's sensor:



The illustration at left annotates Inokawa's Figure 2 to identify the central detector in red and the lens in light blue (*see* Ex. 1003 ¶ 95), and the illustration at right annotates Petitioner's proposed modification of Aizawa to illustrate the peripheral detectors in red and the lens in light blue (*see id.* ¶ 97). As can be seen, the lenses are not identical. In Inokawa the lens's curvature is most pronounced at the center of the lens near the central detector, and in the proposed modification to Aizawa, the lens's curvature is most pronounced at the edges of the lens near the peripheral detectors. Thus, Dr. Kenny's proposed modification of Aizawa takes Inokawa's general teaching of using a convex protrusion lens to increase the amount of incoming light directed to a light detector, and applies it to the four light detectors of Aizawa. *See, e.g., id.* ¶¶ 95–97; Ex. 1047 ¶¶ 8–22.

We are cognizant of Patent Owner's contention that Petitioner's ground "improperly" relies upon a reference, Nishikawa, that was not

IPR2020-01521
Patent 10,292,628 B1

identified as a part of the ground of unpatentability styled as being based on Aizawa and Inokawa.  PO Resp. 32.  As Patent Owner observes, Dr. Kenny characterizes his testimony as being "inspired by" or "motivated" in part based on Nishikawa's disclosure when it comes to the shape of a convex lens.  *See, e.g.*, PO Resp. 33–34 (citing Ex. 2006, 179:21–180:13; Ex. 2007, 364:2–13; Ex. 2008, 73:8–12).  We, however, disagree with Patent Owner that any impropriety arises from Dr. Kenny's contemplation of the teachings of Nishikawa in connection with a convex shape of a lens for a physiological sensor.  The nature of Petitioner's and Dr. Kenny's consideration of Nishikawa is explained in the Petition, even if Nishikawa is not listed as a third reference in the identification of the ground.  *See* Pet. 16–17 (discussing Nishikawa (Ex. 1023) and Dr. Kenny's testimony concerning Nishikawa (Ex. 1003 ¶¶ 95, 96) in proposing the unpatentability of claims of the '628 patent.)  Indeed, it follows readily from the Petition that a skilled artisan would have appreciated that Nishikawa's teachings provide insight as to how "the transparent acrylic material used to make Aizawa's plate can be readily formed into a lens-like shape as in Inokawa."  Pet. 17.  Nishikawa describes how its "lens unit 50" can be a transparent resin formed in the shape illustrated in Figure 6 by injection molding.  Ex. 1023 ¶¶ 22, 32, 35.  Dr. Kenny also explains that Nishikawa's lens shape design "is intended to provide curvature in the lens where it can do the most good and otherwise try to avoid excess use of material in order to create curvature in locations where it wouldn't do any good."  Ex. 2006, 179:21–180:13 (emphasis added).

Moreover, we observe that a rejection based on obviousness "require[s] an analysis that reads the prior art in context, taking account of

IPR2020-01521
Patent 10,292,628 B1

'demands known to the design community,' 'the background knowledge possessed by a person having ordinary skill in the art,' and 'the inferences and creative steps that a person of ordinary skill in the art would employ.'" *Randall Mfg. v. Rea*, 733 F.3d 1355, 1362 (Fed. Cir. 2013) (quoting *KSR*, 550 U.S. at 418). Furthermore, record evidence can be useful to "demonstrate the knowledge and perspective one of ordinary skill in the art." *Id.; see also Ariosa Diagnostics v. Verinata Health Inc.,* 805 F.3d 1359, 1365 (Fed. Cir. 2015) ("Art can legitimately serve to document the knowledge that skill artisan would bring to bear in reading the prior art identified as producing obviousness.")

As noted above, Dr. Kenny makes clear that his view as to obviousness of the claims of the '628 patent was "inspired by" or "motivated" in part by Nishikawa's teachings as to shapes generally known to those in the art in considering manufacturing a lens. *See, e.g.*, Ex. 2007, 364:2–13; Ex. 2008, 73:12–21. We conclude that the record establishes that Nishikawa's teachings are representative of background knowledge of one of ordinary skill in the art and provide context and perspective of a skilled artisan as to the type of shapes available for the convex protruding surface disclosed in Inokawa. That Dr. Kenny considered record evidence cited in the Petition as informing his view of what a skilled artisan would understand as to known types of lens shapes as a part of the Aizawa and Inokawa ground does not establish, in our view, any impropriety as part of that ground.

Patent Owner also contends that Petitioner's modification of Aizawa "fails to consider the greater *decrease* in light at the detectors due to light redirection to a *more* central location." Sur-reply 12–13 (citing Ex. 1015,

IPR2020-01521
Patent 10,292,628 B1

168; Ex. 2027, 19:16–21:8, 49:17–50:13, 57:10–22). Dr. Kenny acknowledges that, when a convex protrusion is added to Aizawa's flat cover, "*some . . .* [light] rays that would have hit the detectors [using a flat cover] are refracted away from the detectors" by the convex protrusion. *See* Ex. 2027, 19:16–21:8 (emphasis added). Dr. Kenny also acknowledges "there is a decrease in the light as you move away from the location of the emitter towards the perimeter of the sensor," which is a "rapid" decrease, perhaps "with the square of the distance" or "exponential[ly]." *Id.* at 49:1–50:13, 57:10–22.

Dr. Kenny, nonetheless, maintains that a person of ordinary skill in the art "would understand how to take advantage of the detector locations and the shape of this convex surface *so as to obtain an improvement [in Aizawa] in the amount of light arriving at the detectors*," despite the foregoing considerations. *Id.* at 20:9–22:18 (emphasis added) (citing Ex. 1047 ¶ 44), 213:12–19, 214:6–215:6. That testimony is persuasive. In particular, the difference in the length traveled by the light rays depending on whether Aizawa's wrist-worn sensor 2 uses a flat plate 6 or a convex plate 6 is extremely small. *See, e.g.*, Ex. 1006, Fig. 1(b), ¶ 26 (dotted line arrows show paths of light from emitter 21 to reflect off artery 11 in wrist 10 and return to detectors 22); *id.* at Fig. 2 (showing detector 1 mounted on a user's wrist, suggesting the general scale of detector 1); Ex. 1047 ¶¶ 8–22 (discussing typical light refractions by lenses in wrist-worn pulse sensors). Based on this scale, it is reasonable to conclude, as Dr. Kenny does, that the central light *lost* by adding a protrusion will be outweighed by the peripheral light *gained* by adding a protrusion, despite the greater distance traveled by

the peripheral light rays and the concomitant loss of intensity acknowledged by Dr. Kenny.

Patent Owner additionally asserts, and Dr. Madisetti testifies, that Petitioner's combination of Aizawa and Inokawa is "problematic" because it overlooks the "small" size of Aizawa's detectors 22 and the openings or cavities 23c in which they are housed. *See* PO Resp. 22 (citing Ex. 1006, Figs. 1(a)–1(b), Ex. 2004 ¶ 65; Ex. 2006, 257:11–18). Patent Owner, however, does not meaningfully articulate what significance the size of Aizawa's detector components have in the obviousness evaluation based on the teachings of the prior art.

We additionally do not agree with Patent Owner's argument that Petitioner's Reply presents new arguments and evidence that should have been first presented in the Petition. *See, e.g.*, Sur-reply 2–14. The Petition proposed a specific modification of Aizawa to include a convex protrusion in the cover, for the purpose of increasing the light gathering ability of Aizawa's device. *See, e.g.*, Pet. 13–17. Patent Owner, in its Response, then challenged that contention with several arguments that Petitioner's proposed convex protrusion would not operate in the way the Petition alleges it would operate. *See, e.g.*, PO Resp. 12–41. In its Reply, Petitioner proceeded to provide arguments and evidence attempting to rebut the contentions in the Patent Owner Response. *See* PTAB Consolidated Trial Practice Guide (Nov. 2019)[11], 73 ("A party also may submit rebuttal evidence in support of its reply."). The Reply does not change Petitioner's theory for obviousness; rather, the Reply presents more argument and evidence in support of the

---

[11]  Available at https://www.uspto.gov/TrialPracticeGuideConsolidated.

IPR2020-01521
Patent 10,292,628 B1

same theory for obviousness presented in the Petition. *Compare* Pet. 13–16, *with* Reply 2–20.

Patent Owner finally argues that a conclusion of obviousness "strains credibility" because the level of ordinary skill in the art (*see supra* Section II.B) does not require specific education or experience with optics or optical physiological monitors. *See, e.g.*, PO Resp. 30–31. We disagree. Concerning motivation, an ordinarily skilled artisan would have readily appreciated from the record at hand that: (1) Aizawa's detector 1 operates by gathering light data with its photodetectors 22; (2) an optical lens would be useful to focus the light on to the photodetectors; and (3) optical lenses often are formed by providing a convex protrusion in the lens to focus light. Indeed, Inokawa discloses such utility, function, and structure as a part of its convex lens. *See, e.g.*, Ex. 1008 ¶¶ 15, 58, Fig. 2.

Concerning reasonable expectation of success in using a convex protrusion lens to increase the amount of light directed to Aizawa's photodetectors, we rely on Dr. Kenny's testimony that a person of ordinary skill in the art would have understood that a lens operates by increasing the light concentration most where the curvature of the lens is the greatest, which leads to Dr. Kenny's proposed lens for use in Aizawa. *See, e.g.*, Ex. 1003 ¶¶ 92–95; Ex. 1047 ¶¶ 8–10, 15–22; Ex. 2006, 179:21–180:13, 202:11–20. We are persuaded that a person of ordinary skill in the art would have understood this general concept of optics.

Thus, we conclude that one of ordinary skill in the art would have had adequate reason to replace Aizawa's flat cover 6 with a cover comprising a convex protrusion, to improve light detection efficiency, and would have had a reasonable expectation of success in doing so.

IPR2020-01521
Patent 10,292,628 B1

####### v.  Summary

Based on the foregoing arguments and evidence, we conclude that
Petitioner has demonstrated by a preponderance of the evidence that claim 1
would have been obvious over Aizawa and Inokawa.

##### 4.  Claims 2–15, 17, 20–26, and 28

As with claim 1, Petitioner provides argument and evidence, including
testimony from Dr. Kenny, in support of its position that claims 2–15, 17,
20–26, and 28 are unpatentable over Aizawa and Inokawa.  Pet. 30–43.
Claims 2–6 ultimately depend from claim 1.  Claims 7 and 20 are
independent claims that are similar in scope to claim 1.  Claims 8–15, 21–
26, and 28 ultimately depend from either claim 7 or claim 20.  Patent Owner
does not advance any arguments for claims 2–15, 17, 20–26, and 28 that are
distinct from those provided for claim 1.  For the same reasons set forth in
section II.D.3 above, we find Patent Owner's arguments unavailing as to
claims 2–15, 17, 20–26, and 28.  We conclude that Petitioner has established
by a preponderance of the evidence that claims 2–15, 17, 20–26, and 28 are
also unpatentable based on Aizawa and Inokawa.

#### E.  Obviousness over Aizawa, Inokawa, and Ohsaki

Petitioner also contends that claims 1–15, 17, 20–26, and 28 of the
'628 patent would have been obvious over the combined teachings of
Aizawa, Inokawa, and Ohsaki.  Pet. 43–46.

##### 1.  Overview of Ohsaki (Ex. 1014)

Ohsaki is a U.S. patent application publication titled "Wristwatch-type
Human Pulse Wave Sensor Attached on Back Side of User's Wrist," and

IPR2020-01521
Patent 10,292,628 B1

discloses an optical sensor for detecting a pulse wave of a human body. Ex. 1014, code (54), ¶ 3.  Figure 1 of Ohsaki is reproduced below.



Figure 1 illustrates a cross-sectional view of pulse wave sensor 1 attached on the back side of user's wrist 4.  *Id.* ¶¶ 12, 16.  Pulse wave sensor 1 includes detecting element 2 and sensor body 3.  *Id.* ¶ 16.

Figure 2 of Ohsaki, reproduced below, illustrates further detail of detecting element 2.



Figure 2 illustrates a mechanism for detecting a pulse wave.  *Id.* ¶ 13. Detecting element 2 includes package 5, light emitting element 6, light receiving element 7, and translucent board 8.  *Id.* ¶ 17.  Light emitting

IPR2020-01521
Patent 10,292,628 B1

element 6 and light receiving element 7 are arranged on circuit board 9 inside package 5. *Id.* ¶¶ 17, 19.

"[T]ranslucent board 8 is a glass board which is transparent to light, and attached to the opening of the package 5. A convex surface is formed on the top of the translucent board 8." *Id.* ¶ 17. "[T]he convex surface of the translucent board 8 is in intimate contact with the surface of the user's skin," preventing detecting element 2 from slipping off the detecting position of the user's wrist. *Id.* ¶ 25. By preventing the detecting element from moving, the convex surface suppresses "variation of the amount of the reflected light which is emitted from the light emitting element 6 and reaches the light receiving element 7 by being reflected by the surface of the user's skin." *Id.*

### 2. *Discussion*

As noted above, we conclude that Petitioner has established that claims 1–15, 17, 20–26, and 28 would have been obvious over the combined teachings of Aizawa, and Inokawa. Petitioner points to Ohsaki as providing "additional motivation and rationale for a [person of ordinary skill in the art] to modify Aizawa to include a 'light permeable cover comprising a protrusion' as per element [1d]." Pet. 45 (citing Ex. 1003 ¶¶ 142–146). In that regard, Petitioner contends that "Ohsaki teaches that adding a convex surface to the light permeable cover (i.e., translucent board 8) can help prevent the device from slipping on the tissue when compared to a flat cover." *Id.* at 45–46 (citing Ex. 1014 ¶ 25; Ex. 1003 ¶ 144). Petitioner also contends that a person of ordinary skill in the art "reviewing Aizawa and Ohsaki would have recognized Ohsaki's use of a convex protrusion in its

IPR2020-01521
Patent 10,292,628 B1

light permeable cover as a desirable configuration that would help to further prevent slippage of Aizawa's device." *Id.* at 46.

Patent Owner first contends that Ohsaki does not remedy the proposed deficiencies that it had argued with respect to the teachings of Aizawa and Inokawa, e.g., a sensor having multiple emitters and at least four detectors. PO Resp. 42–43. As discussed above, however, we do not agree that the teachings of the prior art are deficient as to such features.

Patent Owner also challenges Petitioner's position that a skilled artisan would have viewed Ohsaki's teachings as providing reason to implement a convex surface as a part of Aizawa's sensor device. In that regard, Patent Owner discounts Ohsaki's teachings of a convex cover as providing any slippage alleviating benefit if such a cover is implemented in Aizawa's sensor device. PO Resp. 43–45; Sur-reply 17–20.

We do not agree with Patent Owner. Patent Owner maintains that any benefits that Ohsaki attributes to a convex protrusion are realized only when a sensor and convex surface are placed on the back of the user's wrist, which is alleged to be opposite side of the wrist taught by Aizawa. Yet, we note that Petitioner does not propose bodily incorporating the references; Petitioner simply proposes adding a convex cover to Aizawa's sensor, without discussing where Aizawa's sensor is used. *See, e.g.*, Pet. 45–46. In other words, Petitioner's proposed modification does not dictate any particular placement, whether on the palm side or back side of the wrist.

To be sure, Ohsaki's Figures 3A–3B compare the performance of detecting element 2, including its translucent board 8 having a convex protrusion, and show better performance for a user in motion when the element is attached to the back side of the wrist versus the front side of the

wrist. *See* Ex. 1014 ¶¶ 23–24, Figs. 3A–3B. We, however, do not agree that these figures support Dr. Madisetti's conclusion that "Ohsaki indicates a convex surface only prevents slipping on the back (i.e., watch) side of the wrist in a specific orientation, but tends to slip when used in different locations or orientations" such as the palm side of the wrist—particularly in comparison to a flat surface such as Aizawa's. *See, e.g.*, Ex. 2004 ¶¶ 93. Instead, Ohsaki acknowledges that, even when the detecting element is located "on the front [palm] side of the user's wrist 4, *the pulse wave can be detected well* if the user is at rest." Ex. 1014 ¶ 23 (emphasis added). Thus, Ohsaki discloses that, in at least some circumstances, a convex surface located on the front of the user's wrist achieves benefits. *Id.* Notably also, the claims of the '628 patent are not limited to detection during movement or exercise.

Dr. Kenny testifies that a person of ordinary skill in the art would have understood from Ohsaki that a convex protrusion will help prevent slippage, even in the context of Aizawa's sensor. *See* Ex. 1003 ¶¶ 144–145; Ex. 1047 ¶¶ 50–52. In our view, Dr. Kenny's testimony is consistent with the plain disclosure of Ohsaki. We are cognizant of Dr. Madisetti's opposing testimony. *See, e.g.*, Ex. 2004 ¶¶ 93–95. For instance, Dr. Madisetti testifies that: (1) Ohsaki's disclosure on this point is "exceptionally limited" (*id.* ¶ 93); (2) "a [person of ordinary skill in the art] would have believed that adding Ohsaki's protruding surface would have disrupted the improved adhesion properties reported for Aizawa's flat plate" (*id.* ¶ 95); and (3) Ohsaki's teachings are "incompatible with Aizawa's sensor" (*id.*).

We do not disagree with Dr. Madisetti's views as to what a skilled artisan would have gleaned from the teachings of the prior art. It is true that Aizawa's plate 6 is illustrated as having a flat surface (Ex. 1006, Fig. 1(b)), and that Aizawa states the plate "improve[s] adhesion" (*id.* ¶ 13). Aizawa further states: "the above belt 7 is fastened such that the acrylic transparent plate 6 becomes close to the artery 11 of the wrist 10," and "[t]hereby, adhesion between the wrist 10 and the pulse rate detector 1 is improved." *Id.* ¶ 26. Those disclosures, however, indicate that the improved adhesion is provided by the acrylic material of plate 6, not the shape of the surface of the plate, which is never specifically addressed. *See also id.* ¶¶ 30, 34 ("Since the acrylic transparent plate 6 is provided . . . adhesion between the pulse rate detector 1 and the wrist 10 can be improved . . . ."). Aizawa does not associate this benefit of improved adhesion with the surface shape of the plate, but rather, with the existence of an acrylic plate to begin with.

Furthermore, Ohsaki clearly teaches that the convex surface of its translucent board 8 "is in intimate contact with the surface of the user's skin" such that "it is prevented that the detecting element 2 slips off the detecting positions of the user's wrist 4." Ex. 1014 ¶ 25; *see also id.* ¶ 27 ("The detecting element 2 is stably fixed to the user's wrist 4."). We credit Dr. Kenny's testimony, over that of Dr. Madisetti, that a skilled artisan would have been motivated by such teachings to apply a cover with a convex surface to Aizawa to improve that similar device in the same way and to yield predictable results, i.e., to resist movement of the sensor on the user's wrist. *See, e.g.*, *See* Ex. 1003 ¶¶ 144 ("[a]mong other thing, Ohsaki teaches that adding a convex surface to its translucent board 8 (i.e., light permeable cover) can help prevent the device from slipping on the tissue of

the wearer compared to using a flat cover without such a protrusion" (citing Ex. 1014 ¶ 25)), 145 ("a [person of ordinary skill in the art] in possession of both Aizawa and Ohsaki would have recognized that Ohsaki's addition of a convex protrusion to its light permeable cover could be similarly implemented in Aizawa's device to help achieve the two references' shared goal of minimizing slippage" (citing Ex. 1006 ¶¶ 26, 30)); Ex. 1047 ¶¶ 50–52.  We, thus, are persuaded that a person of ordinary skill in the art would have been motivated to modify Aizawa as proposed, and would have had a reasonable expectation of success in doing so.  The evidence of record adequately demonstrates that a skilled artisan would have appreciated that adding a convex cover, such as that taught by Ohsaki, would have improved adhesion between a sensor, such as that of Aizawa, and a user's skin, thus aiding in the prevention of slippage of the sensor device on the user's skin.

Accordingly, we conclude that the record adequately supports Petitioner's contentions by a preponderance of the evidence that claims 1–15, 17, 20–26, and 28 would have been obvious in view of Aizawa, Inokawa, and Ohsaki.

### F.  Obviousness over Aizawa, Inokawa, Mendelson-2006, and Beyer

Petitioner contends that claims 18, 19, 29, and 30 are unpatentable based on Aizawa, Inokawa, Mendelson-2006, and Beyer.  Pet. 46–55.  Claim 18 depends from claim 7 and includes features directed to a processor that is configured to receive signals indicative of a physiological parameter of a wearer and output information of those parameters to a mobile phone.  Ex. 1001, 46:1–10.  Claim 19 depends from claim 18 and adds the requirement of a "touch-screen display."  *Id.* at 46:10–11.  Claim 29 depends from claim 20 and adds a processor features similar to that set forth in

IPR2020-01521
Patent 10,292,628 B1

claim 18.  *Id.* at 47:1–5.  Claim 30 depends from claim 29 and adds the feature of a touch-screen display.  *Id.* at 47:6–7.

    *1.   Overview of Mendelson-2006 (Ex. 1016)*

Mendelson-2006 is a journal article titled "A Wearable Reflectance Pulse Oximeter for Remote Physiological Monitoring," and discloses a wireless wearable pulse oximeter connected to a personal digital assistant ("PDA").  Ex. 1016, 912.

Figure 1 of Mendelson-2006 is reproduced below.



Figure 1 illustrates a sensor module attached to the skin (top), and a photograph of a disassembled sensor module and receiver module (bottom). The sensor module includes an optical transducer, a stack of round printed circuit boards, and a coin cell battery.  *Id.* at 913.

IPR2020-01521
Patent 10,292,628 B1

Figure 2 of Mendelson-2006 is reproduced below.



Figure 2 depicts a system block diagram of the wearable, wireless, pulse oximeter including the sensor module (top) and the receiver module (bottom). *Id.* The sensor module includes at least one light-emitting diode ("LED"), a photodetector, signal processing circuitry, an embedded microcontroller, and an RF transceiver. *Id.* at 912–913. Mendelson-2006 discloses that a concentric array of discrete photodetectors could be used to increase the amount of backscattered light detected by a reflectance type pulse oximeter sensor. *Id.* at 915. The receiver module includes an embedded microcontroller, an RF transceiver for communicating with the sensor module, and a wireless module for communicating with the PDA. *Id.* at 913.

As a PDA for use with the system, Mendelson-2006 discloses choosing "the HP iPAQ h4150 PDA because it can support both 802.11b

IPR2020-01521
Patent 10,292,628 B1

and Bluetooth™ wireless communication" and "has sufficient computational

resources." *Id.* at 914. Mendelson-2006 further discloses that

> [t]he use of a PDA as a local terminal also provides a low-cost touch screen interface. The user-friendly touch screen of the PDA offers additional flexibility. It enables multiple controls to occupy the same physical space and the controls appear only when needed. Additionally, a touch screen reduces development cost and time, because no external hardware is required. . . . The PDA can also serve to temporarily store vital medical information received from the wearable unit.

*Id.*

The PDA is shown in Figure 3 of Mendelson-2006, reproduced below.



Figure 3 illustrates a sample PDA and its graphical user interface ("GUI").

*Id.* Mendelson-2006 explains that the GUI allows the user to interact with

the wearable system. *Id.* "The GUI was configured to present the input and

output information to the user and allows easy activation of various

functions." *Id.* "The GUI also displays the subject's vital signs, activity

level, body orientation, and a scrollable PPG waveform that is transmitted by

the wearable device." *Id.* For example, the GUI displays numerical oxygen saturation ("SpO$_2$") and heart rate ("HR") values. *Id.*

### 2. Overview of Beyer (Ex. 1019)

Beyer is titled "Cellular Phone/PDA Communication System" and discloses a "cellular PDA communication system for allowing a plurality of cellular phone users to monitor each others' location and status." Ex. 1019, codes (54), (57). Beyer's Figure 1 is reproduced below:



*FIG. 1*

Figure 1 shows a plan view of "handheld cellular phone/PDA communications system" 10. *Id.* at 7:17–19. System 10 includes touch display screen 16. *Id.* at 7:27.

### 3. Discussion

With support from the testimony of Dr. Kenny, Petitioner contends that each of claims 18, 19, 29, and 30 is unpatentable based on Aizawa, Inokawa, Mendelson-2006, and Beyer. Pet. 53–55 (citing Ex. 1003 ¶¶ 68– 71, 147–154; Ex. 1006, ¶¶ 215, 23, 35; Ex. 1008 ¶ 56; Ex. 1016, 912–914,

IPR2020-01521
Patent 10,292,628 B1

Fig. 1; Ex. 1019, 1:6–15, 3:29–33; Ex. 1003 ¶¶ 68–70, 147–154).  For
instance, Petitioner applies the teachings of Mendelson-2006 and Beyer to
account for the processor features required by each of claims 18 and 29 and
the touch-screen display recited in claims 19 and 30.  *Id.*

Patent Owner does not separately address this ground urging only that
the ground "does not fix the deficiencies" that were alleged in connection
with the ground based on Aizawa and Inokawa.  PO Resp. 45.  As discussed
above, we do not agree with Patent Owner as to any such deficiencies.  *See
supra* § II.D.  We have reviewed the Petition and its supporting evidence and
conclude that Petitioner has shown by a preponderance of the evidence that
claims 18, 19, 29, and 30 are unpatentable based on Aizawa, Inokawa,
Mendelson-2006, and Beyer.

### G.  Obviousness over Aizawa, Inokawa, Goldsmith, and Lo

Petitioner argues that claims 18, 19, 29, and 30 of the '628 patent
would have been obvious over Aizawa, Inokawa, Goldsmith, and Lo.  Pet. 2,
57–62.  Because we have already determined that those claims are
unpatentable based on Aizawa, Inokawa, Mendelson-2006, and Beyer, we
need not reach this additional ground applied to those claims.  *See Boston
Sci. Scimed, Inc. v. Cook Grp. Inc.*, 809 F. App'x 984, 990 (Fed. Cir. 2020)
("[T]he Board need not address issues that are not necessary to the
resolution of the proceeding.").

### H.  Obviousness over Mendelson-1988 and Inokawa

Petitioner contends that claims 1–17 and 20–28 are unpatentable over
Mendelson-1988 and Inokawa.  Pet. 62–87.  Patent Owner disagrees.  PO
Resp. 45–59. We conclude that a preponderance of the evidence supports

IPR2020-01521
Patent 10,292,628 B1

Petitioner's assertions that claims 1–17 and 20–28 are unpatentable based on Mendelson-1988 and Inokawa.

    *1.  Overview of Mendelson-1988 (Ex. 1015)*

    Mendelson-1988 discloses a pulse oximeter, with an optical reflectance sensor suitable for noninvasive monitoring of a user's arterial hemoglobin oxygen saturation (SpO$_2$), via the user's forehead. *See* Ex. 1015, 167 (title & abstract). Figure 2 is reproduced below:



Figure 2 illustrates the sensor of Mendelson-1988, including: (A) a top view diagram; (B) a side view diagram; and (C) a photograph. *Id.* at 169.

    The sensor includes two red LEDs and two infrared LEDs for emitting light into the user's tissue, and six photodiodes "arranged symmetrically in a hexagonal configuration" surrounding the four emitters, to detect light reflected back to the sensor from the user's tissue. *Id.* at 168 ("SENSOR DESIGN"). The user's "SpO$_2$ can be calculated from the ratio of the

reflected red and infrared photoplethysmograms." *Id.* at 167. "To minimize the amount of light transmission and reflection between the LEDs and the photodiodes within the sensor, a ring-shaped, optically opaque shield of black Delrin . . . was placed between the LEDs and the photodiode chips." *Id.* at 168 (col. 2). "The optical components were encapsulated inside the package using optically clear adhesive." *Id.* "The microelectronic package was mounted inside a black Delrin housing." *Id.*

### 2. Claim 1

Petitioner provides arguments and evidence, including testimony from Dr. Kenny, in support of its view that claim 1 would have been obvious over Mendelson-1988 and Inokawa. Pet. 62–72; Ex. 1003 ¶¶ 174–183. In opposition, Patent Owner provides arguments and evidence, including testimony from Dr. Madisetti. PO Resp. 45–59; Ex. 2004 ¶¶ 118–125, 201–202.

#### i. Petitioner's Contentions

Petitioner contends that Mendelson-1988's SpO$_2$ sensor discloses each and every limitation of claim 1, except that its light permeable cover (i.e., the "OPTICALLY CLEAR EPOXY" in Figure 2B) lacks the claimed "protruding convex surface." *See* Pet. 67–73; Ex. 1003 ¶¶ 171–186. Petitioner also contends Inokawa's pulse sensor 1 is a noninvasive optical measurement device having a light permeable cover (i.e., lens 27) comprising a convex protrusion arranged to cover its light detector(s) (i.e., detector 25). Pet. 70. Petitioner reasons that an ordinarily skilled artisan would have been motivated, with a reasonable expectation of success, to modify Mendelson-1988's optical SpO$_2$ sensor, in light of Inokawa's optical

IPR2020-01521
Patent 10,292,628 B1

pulse sensor, by adding a convex protrusion to Mendelson-1988's cover to improve the sensor's light detection efficiency. *Id.* at 65–67.

Dr. Kenny provides the following illustrations to portray the proposed modification of Mendelson-1988's sensor (Ex. 1003 ¶¶ 179–180):



At the left, Dr. Kenny has excerpted and annotated Mendelson-1988's Figure 2B, to identify the pre-existing cover (colored blue) which covers the light emitters and detectors. *See id.* At the right, Dr. Kenny has illustrated the device resulting from the proposed modification of the cover to have a convex protrusion (colored blue). *See id.*

Petitioner further asserts "there are two alternative ways of mapping the claimed 'light permeable cover,' or LPC, to the modified cover above." Pet. 70; Ex. 1003 ¶¶ 184–185. Dr. Kenny provides the following two illustrations, annotating Mendelson-1988's Figure 2B, to identify these alternative mappings:

IPR2020-01521
Patent 10,292,628 B1



APPLE-1015, FIG. 2(B)



APPLE-1015, FIG. 2(B).

Dr. Kenny's first mapping (top figure) equates the cover to the entire depth of the epoxy contained within the AIRPAX package as shown in red outline. Ex. 1003 ¶ 184. Dr. Kenny's second mapping (bottom figure) equates the cover to a partial depth of the epoxy within the package as shown in red outline. *Id.* ¶ 185 ("a [person of ordinary skill in the art] would have been able to use the top portion of the housing, as in Nishikawa, to help form the LPC portion on top of the sealing portion.")

Petitioner adds that "a [person of ordinary skill in the art] would have realized that the epoxy layer could have been given a shape that would help further advance Mendelson-1988's objective of improving detection efficiency," "requir[ing] only routine knowledge of sensor design and

assembly." Pet. 64, 66 (citing Ex. 1015, 168, 173); Ex. 1003 ¶¶ 176, 181–

182. For example, "as demonstrated by Nishikawa, molding clear epoxy, as

in Mendelson-1988, into a lens shape was well understood." Pet. 66 (citing

Ex. 1023, Fig. 6, ¶¶ 22, 32, 35, 37).

### ii. Patent Owner's Contentions

Patent Owner is of the view that Petitioner has not met its burden to

demonstrate the obviousness of modifying Mendelson-1988's sensor in light

of Inokawa to have a convex protrusion, based on substantially the same

analysis and testimony discussed above in the context of combining Aizawa

and Inokawa. *See* PO Resp. 47–50; Ex. 2004 ¶¶ 104–110; *supra*

Section II.D.3. For example, Mendelson-1988, like Aizawa, provides a

central emitter or emitters surrounded by several detectors. *Compare*

Ex. 1015, 169 (Fig. 2) (showing four central LEDs surrounded by six

photodiodes), *with* Ex. 1006, Figs. 1(a)–1(b) (showing one central LED 21

surrounded by four photodetectors 22).

Patent Owner also objects to Petitioner's alternative mapping,

providing for a cover with a protrusion to be found in two different ways.

*See* PO Resp. 50–54; Ex. 2004 ¶¶ 113–117. This alternative mapping, in

according to Patent Owner, is "ambiguous[]," and the second mapping

incorporates an "arbitrary" drawn line defining the bottom of the cover in

"an ***undifferentiated*** mass of material." PO Resp. 53–54. Patent Owner

also argues that "Petitioner's inability to consistently identify a 'cover'

reveals the hindsight-driven nature of its arguments." *Id.* at 53.

As with the ground based on Aizawa and Inokawa, Patent Owner here

additionally is of the view that Petitioner errs in referencing Nishikawa as

supporting the unpatentability of claim 1, because Nishikawa is not

IPR2020-01521
Patent 10,292,628 B1

identified as part of Ground 2A which instead "includes only two references" Mendelson-1988 and Inokawa. PO Resp. 56–57 (citing Pet. 2, 66, 71–72, 80; Ex. 2007, 364:2–13; Ex. 2008, 73:8–12; Ex. 2004 ¶¶ 122–123). Patent Owner further asserts that Petitioner's reliance on Nishikawa "makes no sense" based on substantially the same analysis and testimony discussed above in the context of combining Aizawa and Inokawa. *Id.* at 57. Patent Owner similarly takes issue with another prior art reference that is addressed to some extent by Petitioner and Dr. Kenny, namely Mendelson '799.[12] *Id.* at 57–58. Patent Owner argues that Petitioner improperly relies on both Nishikawa and Mendelson '799 "to fill missing gaps [in Mendelson-1988 and Inokawa], not as evidence of general knowledge in the art," thereby attempting to "sidestep the requirements to establish a motivation and expectation of success." *Id.* at 58 (citing Pet. 70; *K/S HIMPP v. Hear-Wear Technologies, LLC*, 751 F.3d 1362, 1366 (Fed. Cir. 2014)); Ex. 2004 ¶ 125.

With respect to claim 7, Patent Owner also contends that "Mendelson-1988 and Inokawa also fail to include a ***circular*** housing with a light permeable cover[.]" PO Resp. 54. Patent Owner characterizes the optical components of each of Mendelon-1988 and Inokawa as being square in shape, and discounts Petitioner's reasoning that one of ordinary skill in the art "would have recognized that microelectronic packaging as used in Mendelon-1988 comes in various shapes and sizes." *Id.* at 55 (quoting Pet. 80). Patent Owner further characterizes Petitioner's and Dr. Kenny's

---

[12] U.S. Patent No. 6,801,799 B2 issued October 5, 2004 (Ex. 1025) ("Mendelson '799").

IPR2020-01521
Patent 10,292,628 B1

testimony that "using a circular housing having a circular wall . . . was common practice" as conclusory. *Id.* at 56 (quoting Pet. 80).

### iii. Petitioner's Reply

In its Reply, Petitioner provides similar analysis and testimony as that discussed above in the context of combining Aizawa and Inokawa. *See* Pet. Reply 27 (citing Pet. 63–65; Ex. 1047 ¶ 54). Specifically, Petitioner contends that an ordinarily skilled artisan would have been motivated, with a reasonable expectation of success, to modify Mendelson-1988 based on Inokawa's teachings to add a lens. *Id.* Petitioner also maintains that the Petition and Dr. Kenny's supporting testimony adequately account for the "cover" required by the claims of the '628 patent, including the "alternative mapping" configuration. *Id.* at 28–30 (citing Pet. 71–72; Ex. 1003 ¶ 185; Ex. 1047 ¶¶ 57–60; Ex. 1009, 395:22–396:8, 396:9–17). Petitioner additionally argues that the Petition accounts for claim 7's requirement of a circular housing based on the teachings of Mendelson-1988 and Inokawa. Pet. Reply 30–31. Petitioner further submits that Dr. Kenny's reference to other prior art references as a part of his testimony, and specifically Nishikawa, is not improper as such reference "provides further support for the actual combination (*i.e.*, Mendelson-1988 in view of Inokawa) by demonstrating how the lens of Inokawa may be incorporated in a manufacturing context." Pet. Reply 31–32 (citing Ex. 1003 ¶¶ 96, 182; Ex. 1047 ¶ 62; Ex. 2007, 364:2–13).

### iv. Patent Owner's Sur-reply

Patent Owner's Sur-reply generally reiterates its arguments challenging Petitioner's contentions as to the obviousness of modifying

IPR2020-01521
Patent 10,292,628 B1

Mendelon-1988's sensor to include a convex protrusion.  *See* Sur-reply 21–
25.

    *v.  Discussion*

    Petitioner contentions that Mendelson-1988's sensor meets several
limitations of claim 1 are not challenged by Patent Owner.  We agree.  For
instance, we are persuaded by Petitioner as to the following.  The sensor is a
noninvasive optical measurement device adapted to be worn on a user's
forehead, to provide an indication of a physiological parameter of the user
(i.e., $SpO_2$).[13]  *See* Ex. 1015, 167 (abstract); Pet. 67; Ex. 1003 ¶ 171.  The
sensor has two infrared LED chips and two red LED chips, i.e., a plurality of
emitters.  *See* Ex. 1015, 168 (col. 2) ("The optical reflectance sensor used in
this study consists of two red (peak emission wavelength: 660 nm) and two
infrared (peak emission wavelength: 930 nm) LED chips"), 169 (Fig. 2A);
Pet. 67–68; Ex. 1003 ¶ 172.  The sensor further includes at least four
detectors (i.e., the six photodiodes) arranged on a housing's surface and
spaced apart from each other, symmetrically on a circle centered on the four
LEDs.  *See* Ex. 1015, 168 (col. 2) (stating the six photodiodes are "arranged
symmetrically in a hexagonal configuration"), 169 (Fig. 2); Pet. 75–76;
Ex. 1003 ¶ 173.  The six photodiodes are configured to output signals
responsive to light emitted from the four emitters and attenuated by the
user's body tissue, with the signals being indicative of the user's $SpO_2$.  *See*
Ex. 1015, 167 (col. 2) ("$SpO_2$ can be calculated from the ratio of the

---

[13]  Whether the preamble is limiting need not be resolved, because the
recitation in the preamble is satisfied by the prior art.

IPR2020-01521
Patent 10,292,628 B1

reflected red and infrared photoplethysmograms."); Pet. 75–76; Ex. 1003 ¶ 171.

We also find that a preponderance of the evidence establishes that the Mendelson-1988 sensor's optically clear epoxy is a light permeable cover that covers the sensor's six detectors. In particular, it is clear from Figures 2A and 2B that the epoxy extends from the top of the sensor at the dotted line in the figure, down into the well of the AIRPAX package, to cover all four LEDs and all six photodiodes disposed at the bottom of the well. *See also* Ex. 1015, 168 (col. 2) ("The optical components were encapsulated inside the package using optically clear adhesive"). Although Patent Owner disagrees, that disagreement is premised on its proposed claim construction of the term "cover" as excluding resins and epoxies. *See* PO Resp. 50–51. For reasons provided in Section III.C.1 above, we do not find that claim construction persuasive, and Patent Owner does not distinguish Mendelson-1988 from claim 1 on this basis.

We determine that Petitioner has established persuasively that Mendelson-1988's sensor teaches every limitation of claim 1, with the exception that its light permeable cover has a flat surface and, thus, does not include an "outwardly protruding convex surface." We, however, conclude that a preponderance of the evidence supports Petitioner's contention that it would have been obvious to modify the top surface of Mendelson-1988's cover to include a convex protrusion, in order to increase the amount of backscattered light that will be received by the six peripheral detectors. Our reasoning is substantially identical to the analysis provided above in connection with the ground based on Aizawa and Inokawa, with Mendelson-1988 replacing Aizawa in the combination. *See supra*

IPR2020-01521
Patent 10,292,628 B1

Section III.D.3. Patent Owner does not cite, and we do not discern, any material difference between Mendelson-1988 and Aizawa that might lead to a different result here, with one possible exception.

That difference is Petitioner's alternative mapping of the claimed "cover" to Petitioner's proposed modification of Mendelson-1988's sensor. We rely on the first mapping, but not Petitioner's second mapping, to decide in Petitioner's favor. Petitioner's first mapping is again reproduced here (Ex. 1003 ¶ 184):



APPLE-1015, FIG. 2(B)

In this modified and annotated version of Figure 2B of Mendelson-1988, Dr. Kenny identifies how Mendelson-1988's light permeable cover ("LPC") may be modified to have a protrusion, wherein the cover (which Dr. Kenny has colored blue) includes the entire depth of the optically clear epoxy contained within the AIRPAX package (as Dr. Kenny has shown in red outline). *Id.* ¶ 140; Pet. 71. Patent Owner objects to this mapping as ambiguous, but we determine Dr. Kenny's annotations reproduced above are sufficiently clear to establish obviousness by a preponderance of the evidence.

As with the ground based on Aizawa and Inokawa, Patent Owner argues that the ground based on Mendelson-1988 and Inokawa is flawed

83

IPR2020-01521
Patent 10,292,628 B1

because of the Petition's and Dr. Kenny's reference to Nishikawa. For the same reasons discussed above (*see supra* § II.D.3.iv.(5)) we find that argument unavailing.

### vi. Summary

For the foregoing reasons, we conclude that Petitioner has demonstrated by a preponderance of the evidence that claim 1 is unpatentable as having been obvious over Mendelson-1988 and Inokawa.

### 3. Claim 7

Claim 7 is similar to claim 1 but includes an additional requirement that the light permeable cover has a "circular housing including a planar surface." Ex. 1001, 45:13. Petitioner provides arguments and evidence, including testimony from Dr. Kenny, in support of the contention that independent claim 7 would have been obvious over Mendelson-1988 and Inokawa. Pet. 79–82; Ex. 1003 ¶¶ 198–205. Much of Petitioner's analysis for claim 7 applies for claim 1, which as discussed above in Section II.H.2 we find persuasive.

With respect to the "circular housing having a planar surface" requirement, Petitioner points to Mendelson's Figures 2(A) and 2(B) and contends that "Mendelson-1988 discloses that its LEDs and photodiode chips (i.e., emitters and detectors) are mounted on a ceramic substrate (*planar surface*) and housed within an AIRPAX microelectronic package (*housing*)." Pet. 79. Petitioner, however, characterizes the housing shown in those figures, specifically Figure 2(A) as "appear[ing] to have a square shape, not a circular one." *Id.* at 80. Petitioner reasons that "[a person of ordinary skill in the art] would have recognized that microelectronic

packaging as used in Mendelson-1988 comes in various shapes and sizes"
and "[a person of ordinary skill in the art] would have considered using a
differently shaped housing, namely a circular one, to be obvious." *Id.* (citing
Ex. 1003 ¶ 202).  Petitioner also contends that employing a circular housing
was "common practice" prior to the '628 patent, and that "there was nothing
new or inventive about changing one housing shape for another. *Id.* (citing
Ex. 1003 ¶ 202).  Petitioner explains that its contentions are evidenced by
another reference of record, Mendelson '799. *Id.*

Patent Owner characterizes Petitioner's proposed ground for claim 7
as "facially deficient" for several reasons:  (1) "Petitioner never identifies a
motivation to pick a circular-shaped housing instead of the existing square
shape"; (2) "[a person of ordinary skill in the art] would have no particular
motivation to change the shape unless a [person of ordinary skill in the art]
perceived some benefit in doing so"; (3) "Mendelson '799 does not disclose
a cover (or even epoxy encapsulation) and thus cannot disclose a circular
housing and a cover of the circular housing, as claim 7 requires"; and (4)
"Petitioner did not include Mendelson '799 in any ground."  PO Resp. 55–
56 (citing Ex. 2004 ¶¶ 120–121).

In response to Patent Owner's arguments, Petitioner replies that
"references like Mendelson [']799 have a circular wall/housing and confirm
the notion that a [person of ordinary skill in the art] would have found it to
be simply a matter of design choice to use different shapes."  Pet. Reply 30–
31 (citing Ex. 1003 ¶ 201; Ex. 1025, Fig. 7, 9:34–36; Ex. 1047 ¶ 61).
Petitioner also contends "neither the '628 patent nor [Patent Owner]
provides any explanation of how the particular housing shape solves some

problem or presents some unexpected result." *Id.* at 31 (citing *In re Kuhle*, 526 F.2d 553, 555 (CCPA 1975)).

Patent Owner responds that "Petitioner's reply reiterates its conclusory arguments that [the proposed] change would be routine, without identifying any reason to modify the shape from square to circular." Sur-reply 24.

On the record before us, we conclude that a preponderance of the evidence supports Petitioner's contention that it would have been obvious to modify the shape of Mendelson-1988's AIRPAX package from square to circular. Petitioner's and Dr. Kenny's general assessment that a person of ordinary skill in the art would have been aware that a circular housing shape was a known option for housing of components of a physiological sensor finds support in the record. Pet. 79–80; Ex. 1003 ¶ 201. In that respect, although Mendelson '799 was not listed in the styling of the proposed grounds of unpatentability based on Mendelson-1988 and Inokawa, its teachings plainly were offered in the Petition as evidence of the background knowledge that an ordinarily skilled artisan would have brought to bear in an evaluation of the teachings Mendelson-1988 and Inokawa. Pet. 79–80. Moreover, it is clear that Patent Owner understood that the proposed ground offered in the Petition took into account the disclosure of Mendelson '799, and Patent Owner had opportunity to address that disclosure. Indeed, Patent Owner availed itself of that opportunity during trial (*see, e.g.*, PO Resp. 54–56; Sur-reply 24).

We further find unavailing Patent Owner's argument that "Mendelson '799 does not disclose a cover (or even epoxy encapsulation) and thus cannot disclose a circular housing and a cover of the circular housing, as

IPR2020-01521
Patent 10,292,628 B1

claim 7 requires." PO Resp. 56.   Figure 7 of Mendelson '799 is reproduced

below:



*Figure 7*

Figure 7 is a top view of optical sensor 10 comprising light source 12
composed of three LEDs 12A, 12B, and 12C emitting light of three different
wavelengths, and an array of six near detectors 18 and six far detectors 16
"arranged in two concentric ring-like arrangements" surrounding light
source 12.  Ex. 1025, 9:23–34.  "All these elements are accommodated in a
sensor housing 17" which, as can be seen in Figure 7, is clearly circular.  *Id.*
at 9:34–35.  Patent Owner does not articulate why the presence or absence of
a cover in Mendelson '799 somehow serves to discount Mendelson '799's
unambiguous presentation of a sensor housing having a shape recognizable
as circular.

Furthermore, one of ordinary skill in the art would have understood
that the AIRPAX package of Mendelson-1988 and the housing 17 of
Mendelson '799 are performing the same function of enclosing a central
collection of light emitters which are surrounded by an array of light

IPR2020-01521
Patent 10,292,628 B1

detectors in an optical sensor attached to a user's body.  *See, e.g.*, Ex. 1015, Figs. 2A–2B; Ex. 1025, Fig. 7.  The evidence of record also does not suggest that the shape of such a housing has any functional significance in the operation of the optical sensor, or that any particular known shape was preferred or restricted.  Thus, the evidence suggests that a square shape and a circular shape of such as housing were known in the art to be predictable substitutes for one another, and therefore obvious variants.  *See, e.g.*, *KSR*, 550 U.S. at 416 ("[W]hen a patent claims a structure already known in the prior art that is altered by the mere substitution of one element for another known in the field, the combination must do more than yield a predictable result."); *id.* at 417 ("[W]hen a patent 'simply arranges old elements with each performing the same function it had been known to perform' and yields no more than one would expect from such an arrangement, the combination is obvious." (citation omitted)).

We conclude Petitioner has demonstrated by a preponderance of the evidence that Petitioner's ground based on Mendelson-1988 and Inokawa conveys the unpatentability of claim 7.

4.  *Claims 2–6, 8–17, and 20–28*

Petitioner provides argument and evidence, including testimony from Dr. Kenny, in support of its position that claims 2–6, 8–17, and 20–28 are unpatentable over Mendelson-1988 and Inokawa.  Pet. 73–79, 82–87.  Patent Owner does not advance any arguments for claims 2–6, 8–17, and 20–28, that are distinct from those provided for claims 1 and 7.  *See* PO Resp. 59.  For the same reasons set forth in Sections II.H.2 & 3 above, we find Patent Owner's arguments unavailing as to claims 2–6, 8–17, and 20–28.  Having evaluated the Petition and its underlying supporting evidence, we conclude

IPR2020-01521
Patent 10,292,628 B1

that Petitioner has established by a preponderance of the evidence that
claims 2–6, 8–17, and 20–28 are also unpatentable based on Mendelson-
1988 and Inokawa.

I.    *Obviousness over Mendelson-1988, Inokawa, Mendelson-2006, and*
*Beyer*

Petitioner contends that claims 18, 19, 29, and 30 are unpatentable
based on Mendelson-1988, Inokawa, Mendelson-2006, and Beyer.
Petitioner relies on Mendelson-2006 and Beyer to satisfy the processor and
touch-screen display requirements set forth in those claims.  Pet. 87–93.
Patent Owner does not dispute Petitioner's reliance on the teachings of
Mendelson-2006 and Beyer.  Rather, Patent Owner challenges this ground
for the same reasons that were advanced for the ground based on
Mendelson-1988 and Inokawa.  PO Resp. 59.  As discussed above (*see
supra* § II.H), we find those arguments unavailing.  Having reviewed the
Petition and its underlying supporting evidence, we conclude that Petitioner
has established by a preponderance of the evidence that claims 18, 19, 29,
and 30 are unpatentable for obviousness based on Mendelson-1988,
Inokawa, Mendelson-2006, and Beyer.

III. CONCLUSION

In summary, we determine that a preponderance of the evidence
establishes claims 1–30 of the '628 patent are unpatentable, as shown in the
following table:[14]

---

[14]  Should Patent Owner wish to pursue amendment of the challenged claims
in a reissue or reexamination proceeding subsequent to the issuance of this
decision, we draw Patent Owner's attention to the April 2019 *Notice
Regarding Options for Amendments by Patent Owner Through Reissue or*

IPR2020-01521
Patent 10,292,628 B1

| Claim(s) | 35 U.S.C. § | References | Claims Shown Unpatentable | Claims Not Shown Unpatentable |
|---|---|---|---|---|
| 1–15, 17, 20–26, 28 | 103 | Aizawa, Inokawa | 1–15, 17, 20–26, 28 | |
| 1–15, 17, 20–26, 28 | 103 | Aizawa, Inokawa, Ohsaki | 1–15, 17, 20–26, 28 | |
| 18, 19, 29, 30 | 103 | Aizawa, Inokawa, Mendelson-2006, Beyer | 18, 19, 29, 30 | |
| 18, 19, 29, 30 | 103 | Aizawa, Inokawa, Goldsmith, Lo[15] | | |
| 1–17, 20–28 | 103 | Mendelson-1988, Inokawa | 1–17, 20–28 | |
| 18, 19, 29, 30 | 103 | Mendelson-1988, Inokawa, Mendelson-2006, Beyer | 18, 19, 29, 30 | |
| **Overall Outcome** | | | 1–30 | |

---

*Reexamination During a Pending AIA Trial Proceeding.  See* 84 Fed. Reg. 16,654 (Apr. 22, 2019).  If Patent Owner chooses to file a reissue application or a request for reexamination of the challenged patent, we remind Patent Owner of its continuing obligation to notify the Board of any such related matters in updated mandatory notices.  *See* 37 C.F.R. §§ 42.8(a)(3), (b)(2).

[15]  As explained above in Section II.G, because we conclude that claims 18, 19, 29, and 30 are unpatentable on other grounds, we do not reach the merits of this ground.

IPR2020-01521
Patent 10,292,628 B1

## IV. ORDER

Upon consideration of the record before us, it is:

ORDERED that claims 1–30 of the '628 patent have been shown to be unpatentable; and

FURTHER ORDERED that, because this is a final written decision, parties to the proceeding seeking judicial review of the decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

IPR2020-01521
Patent 10,292,628 B1

FOR PETITIONER:

W. Karl Renner
Roberto Devoto
Hyun Jin In
FISH & RICHARDSON P.C.
axf-ptab@fr.com
devoto@fr.com
in@fr.com

FOR PATENT OWNER:

Joseph R. Re
Stephen W. Larson
Jarom D. Kesler
Jacob L. Peterson
KNOBBE, MARTENS, OLSON, & BEAR, LLP
2jrr@knobbe.com
2swl@knobbe.com
2jzk@knobbe.com
2jup@knobbe.com

## CERTIFICATE OF SERVICE

I hereby certify that the original of this Notice of Appeal was filed via U.S.P.S. Priority Mail Express on April 12, 2022 with the Director of the United States Patent and Trademark Office at the address below:

Office of the Solicitor
United States Patent and Trademark Office
Mail Stop 8, Post Office Box 1450
Alexandria, VA 22313-1450

A copy of this Notice of Appeal is being filed and served on April 12, 2022 as follows:

**To the USPTO Patent Trial and Appeal Board:**
Patent Trial and Appeal Board
Madison Building East
600 Dulany Street
Alexandria, VA 22313

(*via PTAB E2E – as authorized by the Board*)

**To the U.S. Court of Appeals for the Federal Circuit:**
Clerk of Court
U.S. Court of Appeals for the Federal Circuit
717 Madison Place, N.W.
Washington, DC 20439

(*via CM/ECF – with filing fee*)

**Counsel for Petitioner Apple, Inc.**

W. Karl Renner, Reg. No. 41,265
Roberto J. Devoto, Reg. No. 55,108
Hyun Jin In, Reg. No. 70,014
Fish & Richardson P.C.
3200 RBC Plaza

60 South Sixth Street
Minneapolis, MN 55402
Tel: 202-783-5070
Fax: 877-769-7945
IPR50095-0006IP1@fr.com
PTABInbound@fr.com
axf-ptab@fr.com
devoto@fr.com
in@fr.com

(*via email pursuant to 37 C.F.R. § 42.6(e)*)


Dated:  April 12, 2022                    /Jarom D. Kesler/
                                          Jarom D. Kesler (Reg. No. 57,046)

                                          Attorney for Patent Owner
                                          Masimo Corporation

55434478